IN THE U.S. DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSIE WILLIAMS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:07-CV-00321-WKW-TFM |
| VS | ) | |
| | ) | |
| VIVA HEALTH, INC. | ) | |
| and RICKY CRAPP | ) | |
| | ) | |
| Defendant. | ) | |

---

## PLAINTIFF'S MOTION TO REMAND

---

**COMES NOW** the Plaintiff, Susie Williams, by and through her undersigned counsel of record, and moves this honorable Court to remand this case to the Circuit Court of Bullock County, Alabama, from which is was improperly removed by Defendants. In support of this motion, Plaintiff shows unto the Court as follows:

1.  On March 13, 2007  Plaintiff, a resident of Bullock County, Alabama filed a complaint against Viva Health Inc. and Ricky Crapp in the Circuit Court of Bullock County, Alabama. Plaintiff's claims against the Defendant in the State Court action consists of the following State Law claims: (1) Negligent Procurement, (2) Negligence, (3) Wantonness, (4) Outrage, (5) Breach of Contract, (6) Negligent Hiring, Training and Supervision.

2.  On April 12, 2006 Defendant Viva Health Inc. Improperly removed the State Court action from the Circuit Court of Bullock County to this Court pursuant to § 28 U.S.C. 1446. Defendant Viva's argument for removal rest on the contention that Plaintiff state law claims are completely pre-empted by the Medicare Act / MMA.

3.    It is well-settled that removal must be based on the existence of a Federal District Court's original jurisdiction of a State Court action. See 28 U.S.C. § 1441(a); *Caterpillar, Inc. v Williams 482 U.S. 386, 319-392, (1987)*. Defendant bears the burden of establishing this Court's subject matter jurisdiction. *Laughlin v Prudential Insurance Company 882 F. 2nd 187, 190 (5th Circuit 1989): B. Inc. 663 F. 2nd at 549; Lowe v Ingall's Shipbuilding, 723 F. 2nd 1137, 1177 citing Epps v Bexar -Medina-Atascossa Counties Water Improvement District No. 1 665 F. 2nd 594, 595 (5th Circuit 1982)*. If Federal jurisdiction is even "doubtful" this case must be remanded, *Williams v Tri-County Community Center 323 F. Supplement 286, 288 (SD Miss. 1971)* A defendant may remove a state Court action to Federal Court only if the action could have been originally filed in Federal Court, *Caterpiller Inc. v Williams 482 U.S. 386, 391-391 (1987)*

4.    This Court lacks federal question jurisdiction. Plaintiffs have asserted only state law claims. Defendant Viva has the burden of demonstrating that a substantial question of Federal Law is necessary to the resolution of Plaintiff's claims. *Franchise Tax Board v Construct Laborers Vacation Trust 463 U. S. 1, 103 Supreme Court 2841, 2846 77 Law Ed. 2nd 420 (1983); Kidd v Southeast Airlines 891 F. 2nd 540, 542-543 (5th Circuit 1990) First National Reserve L.C. v Vaughn 931 F. Supp. 463, 468 (E. D. Tex 1996); Rogers v Modern Woodmen of America 1997 W. L. 206757, *4 ( N. D. Miss 1997)*. The fact that a state law claim related to a federal issue, or involves an interpretation of a federal law, does not necessarily establish a federal question and provide removal jurisdiction. *Merrell Dow Pharmaceutical Inc. v Thompson 478 U.S. 804, 106 Supreme Court 3229 (1986)*.

5.    It is well established law that the Medicare Statutory provisions do not provide for "complete preemption". *Burke v Humana Insurance Company 1995 W.L. 841678 *2 (M. D.,*

*Ala). Grace v Interstate Life & Accident Insurance Company 816 F. Supplement 1185, 1191 (M.D. Ala 1996)*

6.    Defendant Viva's arguments can only be described as specious and wholly without merit.

7.    Plaintiff offers their memorandum of law in support of remand and request the defendant be made to pay Plaintiff's Attorney's fees and cost associated with defending this improper removal to Federal Court.

Wherefore, Plaintiff requests this honorable Court remand this case to the Circuit Court for Bullock County, Alabama without delay, as Plaintiff is elderly and worried sick about getting her insurance straight. Plaintiff request Attorney's fees and cost for this improper removal pursuant to 28 U.S.C. § 1447(c).

Plaintiff by counsel:

/s/ L. Cooper Rutland, Jr.
L. Cooper Rutland, Jr.(RUT010)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSIE WILLIAMS, | ) | |
| Plaintiff, | ) | |
| vs | ) | 2:07-CV-00321-WKW-TFM |
| VIVA HEALTH, INC. and | ) | |
| RICKY CRAPP | ) | |
| Defendant. | ) | |

CERTIFICATE OF SERVICE

I hereby certify that on the _25th_ day of _April_ 2007, I electronically filed

the foregoing Plaintiff's Motion to Remand with the Clerk of the Court using the CM/ECF system

which will send notification of such filing to the following CM/ECF participants:


James S. Christie, Jr. Esq.
Amelia T. Driscoll, Esq.
Bradley Arant Rose & White LLP
1819 Fifty Avenue North
Birmingham, AL 35203-2104


　　　　　　　　　　　　　　　　　　 _/s/ L. Cooper Rutland, Jr._
　　　　　　　　　　　　　　　　　　 L. Cooper Rutland, Jr.  (RUT010)
　　　　　　　　　　　　　　　　　　 Rutland Law LLC
　　　　　　　　　　　　　　　　　　 208 North Prairie Street
　　　　　　　　　　　　　　　　　　 Post Office Box 551
　　　　　　　　　　　　　　　　　　 Union Springs, Alabama 36089

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSIE WILLIAMS, | ) | |
| Plaintiff, | ) | |
| vs | ) | 2:07-CV-00321-WKW-TFM |
| VIVA HEALTH, INC. and | ) | |
| RICKY CRAPP | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF
## MOTION TO REMAND

**COMES NOW** the Plaintiff by and through her undersigned counsel of record, and offers this Memorandum of Law in Support of her Motion to Remand filed contemporaneously herewith.

### INTRODUCTION

Plaintiff filed this case against Viva Health, Inc. (Hereinafter "Viva") and Ricky Crapp, their agent, in the Circuit Court of Bullock County, Alabama, on March 13, 2007. Plaintiff's complaint brings state law claims asserting that Defendants were negligent in the procurement of medical insurance for Plaintiff, negligent in handling her dis-enrollment, committed acts that were wanton, outrageous, breached their contract with Plaintiff and were negligent in their hiring, training, and supervision of Defendant, Crapp. Defendant Viva and Crapp have exposed Plaintiff to health care costs that were covered under her Public Education Employees Health Insurance Plan (PEEHIP). This has upset Plaintiff greatly as she is an insulin dependent diabetic whose medical costs far exceed the "credible coverage" offered by Defendant.

This case is before the Court as a result of Viva's improper removal pursuant to 28 U.S.C.

§1446. At its core, Defendant relies on the argument that Plaintiff's state law claims, are completely preempted by federal law, that is, the Medicare Act/MMA. Defendant, Viva is misleading the Court by picking out sections of the MMA and claiming they cover Title 42 in its entirety. It is well settled law from this district that the Medicare Act/MMA does not "preempt the field" and as such this Court lacks federal question jurisdiction.

ARGUMENT

I. <u>Plaintiff's claims have not invoked federal question jurisdiction</u>.

No issues of federal law are raised on the face of the Plaintiff's complaint and no relief premised on federal law is sought from this Court or the State Court.

A defendant may remove a civil action from State Court to Federal Court provided that the Federal Court has original jurisdiction over the Plaintiff's claims. 28 U.S.C.§1441(a). The propriety of the Defendant's removal on federal question grounds depends upon whether any of the Plaintiff's claims arise under federal law, thereby giving this Court original federal question jurisdiction over the claims. 28 U.S.C.§1331. "The district court shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."

Whether a claim arises under federal law so as to confer federal question jurisdiction under 28 U.S.C.§1331, is governed by the "well-pleaded complaint" rule, which provides that "federal jurisdiction exists only when a federal question is presented on the face of the Plaintiff's properly pleaded complaint." *Caterpillar v Williams*. 482 U.S. 386,392,107 S.Ct. 2425, 2429, 96C. Ed 2d 318 (1987) Because the "well-pleaded complaint" rule provides for the determination of jurisdiction solely on the basis of the Plaintiff's complaint, the rule makes the Plaintiff master of the claim and federal jurisdiction may be avoided by exclusive reliance on state law. *Caterpillar* id at 392

The Plaintiff in the instant action brought only state law claims. None of the relief sought

by Plaintiff is preempted by federal law. The complaint specifically states:

> **Plaintiff brings all claims under applicable Alabama statutes and makes no claims which would in any way invoke federal jurisdiction**. (See Complaint Paragraph 6 attached as part of Exhibit 1 to Defendant's Notice of Removal).

Federal question jurisdiction arises when a Plaintiff sets forth allegations "founded on a claim or right arising under the Constitution, treaties or laws of the United States 28 U.S.C. §1441(b). Utilizing the "well-pleaded complaint" rule, if on its face the complaint raises no issue of federal law, then, federal question jurisdiction is lacking. *Franchise Tax Bd v Laborers Vacation Trust* 463 U.S. 1, 10, 103 S.Ct. 2841, 77L. Ed. 2d 420 (1983). Rather than admit no federal claims were made, Defendants assert that this Court has federal question jurisdiction based on (a) preemption of state law by the MMA and (b) the claims involve a "substantial disputed area of federal law" or a necessary "embedded" element of the claim. (See Defendant's Notice of Removal Paragraph 12).

II. The Medicare Act/MMA does not provide for "complete preemption"

Defendants in an attempt to deceive this Court make a rather specious argument regarding the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA's) preemption of state law.

Defendant first begin by taking a partial quote from 42 U.S.C.§1395w-26(b)(3) regarding preemption of state law. Plaintiff has attached the entire text of §1395w-26 as well as the text from 42 U.S.C.§1395w-25 (see Exhibit A). The Court will note that §1395W-25 directs that Medicare +Choice Programs (like Viva) are organized and licensed under state law. (See (a) emphasis added.) Then §1395w-25 makes exceptions for provider sponsored organizations allowing them to avoid state licensing and establishes federal standards that supercede state law in this specific area. [See (E)(iv)] 42 U.S.C. 1395w-26 (which Defendant claims is authority for field preemption). §1395w-26 establishes solvency standards for provider-sponsored organizations. §1395-w-26 C (a)(1)(A)

references the previous §1395w-25.Clearly if Defendant had bothered to read the entire statute, they would have known that the intent was to preempt the states regarding rules that govern the qualifications of "provider sponsored organizations" and nothing more. Defendants urge the Court to "look at the statutory framework, structure and purpose of the statute as a whole" to find preemption. Defendants attempt to use the *Code of Federal Regulations* to rehash their argument regarding 42 U.S.C.§1395w-26 (Both the CFR and USC section refer to solvency standards of Medicare + Choice Providers and nothing else)[1] Defendants try to spin the complaint to fit their argument by claiming they were following the law and could not "cherry pick" or health screen Mrs. Williams.

Plaintiff has made no claim that involves Defendant's marketing materials. Defendant's knew Plaintiff had health insurance through "PEEHIP". Defendant's first letter to Plaintiff evidences that knowledge. (see Exhibit B)

VIVA was well aware of Plaintiff's health insurance and instead of comparing her present coverage to what she would be getting through VIVA, Defendant assured her she would get better coverage for less money. Helping the Plaintiff make an informed decision about changing insurance is not what "cherry picking" is all about and Defendants know this.[2]

Plaintiff is not trying to circumvent the MMA and none of Plaintiff's state law claims are contrary to the standards or restricts the government's ability to carry out the requirements of the MMA. 42U.S.C.§1395w-104 dealing with medical drug benefit programs Part (D)(5)(A) and (B) relative to state laws only supercede state law that:

---

[1]Defendants make cite references to the *Federal Register* without parenthetical cites to the CFR indicating the rule or regulation was entered into the *Code of Federal Regulations*.

[2]It's ironic to Plaintiff that Defendant is so adverse to "cherry picking" customers yet so enthusiastic when "cherry picking" statutes from the MMA to support their removal of this case.

(A) is contrary to the standards or restricts the ability to carry out this part; and

(B) pertains to the electronic transmission of medication history and of information on eligibility, benefits and prescriptions with respect to covered Part D drugs under this part.  (See Exhibit C at Page 10)

For the sake of demonstrating how absurd Defendants' arguments are Plaintiff would point out that pursuant to 42 U.S.C. §1395, this Court is prohibited from interfering in this case.

> "Nothing in this sub-chapter shall be construed to authorize <u>any federal officer or employee</u> to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided... or to exercise any supervision or control over the administration or operation of any such institution, agency or person." 42 U.S.C. §1395

Based on the language contained herein, no one in the federal government's employ can tell Defendant how to administer its business to its customers (see Exhibit D).

In 42 U.S.C. §1395(b) the law states that "nothing in the MMA shall preclude any state from providing, protection against the cost of any health service." Clearly, corporate greed and fraud, the type exhibited by Defendant, Viva, contributes to the high cost of health care to which the federal government gives states free reign to deal with as they see fit. (see Exhibit E)

The point is, there is no intent on the part of Congress to preempt state law simply because Medicare is involved.  "Congress' intent to preempt state law may be explicitly stated in the language of federal statute or implicitly contained in the structure and purpose of the statute. *Jones v Rath Packing Co.* 430 U.S. 519, 525 97 S. Ct. 1305, 51L. Ed 2d 604 (1977).

The Supreme Court has identified three types of preemptions (1)Express (2) field, and (3) conflict. *This That and The Other Gift & Tobacco, Inc..v Cobb County, GA.*, 285 F. 3d 1319, 1322 (11th Cir 2002) "Express" preemption occurs when Congress has manifested its intent to preempt

state law explicitly in the language of the statute. If Congress does not explicitly preempt state law, however, preemption still occurs when federal regulations in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it; this is known as "field preemption" or "occupying the field." *English v General Electric Co.* 496 U.S. 72, 79, 110 S.Ct 2270 2277 110 L. Ed 2d 65 (1990) "Conflict preemption" arises when it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law." *Crosby v National Foreign Trade Council*, 530 U.S. 363, 372-73, 120 S.Ct 2228, 2294, 147 L. Ed 2d 352 (2000)

True, there are instances where Congress has preempted state law regarding certain parts of the MMA. However, Plaintiff has provided other portions of the MMA where state law is only partially preempted and in other areas given wide latitude to protect its citizens. Clearly, Congress has not "occupied the field" when it comes to the Medicare Act. Lastly, Defendants have offered no evidence that Plaintiff's state law claims make it impossible to carry out the federal rules or that state and federal laws are in conflict on this issue.

Plaintiff has no claim for Medicare benefits that have been denied her. She, therefore, has no reason to go through an administrative hearing. Plaintiff sued VIVA because they negligently screwed up her insurance.[3] Defendants claim they would have paid her bill anyway. This was not the answer given Plaintiffs pharmacist when he tried to assist Plaintiff in getting this mess straightened out. See Affidavit of Thoms Main (Exhibit G) §405 of the Social Security Act as it relates to 42 U.S.C. §1395ii has no relevance to Plaintiff's claims. Defendants' attempt to select portions of the MMA and claim complete preemption are feeble. It is clear from just the few

---

[3]Defendants after being hailed into Court for their wrongdoing try to "put the money back in the Bank" after they got caught (see Defendants' letter to Plaintiff Exhibit F).

sections Plaintiff has provided that Congress has never intended to "occupy the field" with regard to the Medicare Act. "The touchstone of the Federal District Courts removal jurisdiction is...the intent of Congress." *Burke v Humana Insurance Co.*, 1995 WL841678 2-3 (MD Ala)

The Court in *Burke* determined that although the statutory provisions regarding Medicare are extensive, "they are not sufficiently similar to the Civil enforcement and jurisdictional provisions in the LMRA and ERISA id.[4]

Again in *Grace v Interstate Life & Accident Ins. Co.*, 916F. Supp. 1185, 1191 (M.D. Ala. 1996) Defendants removed the case contending the Plaintiff's claims gave rise to federal question jurisdiction because they involved "an analysis of benefits provided under Medicare and Medicaid." Defendant VIVA makes a similar claim of "embedded" issues in this case. The Court remanded *Grace* citing the lack of preemption in *Burke*. Given the holdings in Grace and Burke by this Court, this case is due to be remanded to the Circuit Court.

III. <u>Plaintiff is entitled to expenses and attorneys fees as a result of Defendants Removal</u>

With full knowledge that case law from the Middle District of Alabama holds the MMA does not provide federal question jurisdiction, Defendant VIVA removed this case from state court relying on a very deceptive and specious argument to claim federal preemption of all claims that in any way relate to the Medicare Act. Defendants have acted in bad faith in trying to use sections of the federal law that have no application to any of the facts in this case to claim federal preemption. Defendants try to twist the pleadings by giving self-serving interpretations of what the complaint says. Plaintiff has utilized the "well-pled complaint" rule to make all parties aware that she makes

---

[4]The Supreme Court has found "complete preemption of state law claims exist in only a few rare instances, i.e. §301 of the Labor Management Relations Act of 1947 and §502 of the Employee Retirement Income Security Act of 1974" *Burke v Humana* 1995 WL841678 2-3 (MD Ala)

no claims that would invoke federal jurisdiction yet Defendants still removed this case. Defendants cannot provide any objectively reasonable basis for removing this matter. Therefore, Plaintiffs are entitled to an award of "just costs and any actual expenses, including attorneys' fees incurred as a result of the removal pursuant to 28 U.S.C. § 1447(c)

CONCLUSION

Defendant VIVA has failed to meet its burden of demonstrating that a substantial question of federal law is necessary to the resolution of Plaintiff's claims. Defendants' arguments that Plaintiff's state law claims are "completely preempted" by the MMA are spurious, rife with half truths and offered with the intent to mislead this Court. For those reasons, this case should be remanded to the Circuit Court of Bullock County, Alabama, and the Plaintiff should be awarded attorney's fees and cost pursuant to 28 U.S.C. §1447. Defendants' conduct in this removal is to delay Plaintiff's claims. Mrs. Williams is old and has serious medical conditions which Defendants can exploit in the same way they take advantage of the elderly and infirm. Plaintiff requests with all due respect, that this Honorable Court take haste in remanding this case as its resolution is critical to Plaintiff's health and physical well being.

Plaintiff, by Counsel

/s/ L. Cooper Rutland, Jr.
L. Cooper Rutland, Jr. (RUT010)

OF COUNSEL:

Rutland Law, L.L.C.
Post Office Box 551
208 North Prairie Street
Union Springs, AL 36089
334-738-4770
lcrj@ustconline.net

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSIE WILLIAMS, | ) | |
| Plaintiff, | ) | |
| vs | ) | 2:07-CV-00321-WKW-TFM |
| VIVA HEALTH, INC. and | ) | |
| RICKY CRAPP | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on the __25th__ day of __April__ 2007, I electronically filed

the foregoing Plaintiff's Memorandum of Law in Support of Motion to Remand with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the following

CM/ECF participants:


James S. Christie, Jr. Esq.
Amelia T. Driscoll, Esq.
Bradley Arant Rose & White LLP
1819 Fifty Avenue North
Birmingham, AL 35203-2104


                              /s/ L. Cooper Rutland, Jr.
                              L. Cooper Rutland, Jr. (RUT010)
                              Rutland Law LLC
                              208 North Prairie Street
                              Post Office Box 551
                              Union Springs, Alabama 36089

# EXHIBIT A

## 42 USC § 1395w-25

### United States Code (USC)

**Title 42 - THE PUBLIC HEALTH AND WELFARE**

**Chapter 7 - SOCIAL SECURITY**

**42 USC § 1395w-25 Organizational and financial requirements for Medicare+Choice organizations; provider-sponsored organizations**

---

**42 USC § 1395w-25. Organizational and financial requirements for Medicare+Choice organizations; provider-sponsored organizations**

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Part C - Medicare+Choice Program

(a) Organized and licensed under State law

(1) In general

Subject to paragraphs (2) and (3), a Medicare+Choice organization shall be organized and licensed under State law as a risk-bearing entity eligible to offer health insurance or health benefits coverage in each State in which it offers a Medicare+Choice plan.

(2) Special exception for provider-sponsored organizations

(A) In general

In the case of a provider-sponsored organization that seeks to offer a Medicare+Choice plan in a State, the Secretary shall waive the requirement of paragraph (1) that the organization be licensed in that State if -

(i) the organization files an application for such waiver with the Secretary by not later than November 1, 2002, and

(ii) the Secretary determines, based on the application and other evidence presented to the Secretary, that any of the grounds for approval of the application described in subparagraph (B), (C), or (D) has been met.

(B) Failure to act on licensure application on a timely basis

The ground for approval of such a waiver application described in this subparagraph is that the State has failed to complete action on a licensing application of the organization within 90 days of the date of the State's receipt of a substantially complete application. No period before August 5, 1997, shall be included in determining such 90-day period.

(C) Denial of application based on discriminatory treatment

The ground for approval of such a waiver application described in this subparagraph is that the State has denied such a licensing application and -

(i) the standards or review process imposed by the State as a condition of approval of the license imposes any material requirements, procedures, or standards (other than solvency requirements) to such organizations that are not generally applicable to other entities engaged in a substantially similar business, or

(ii) the State requires the organization, as a condition of licensure, to offer any product or plan other than a Medicare+Choice plan.

(D) Denial of application based on application of solvency requirements

With respect to waiver applications filed on or after the date of publication of solvency standards under section 1395w-26(a) of this title, the ground for approval of such a waiver application described in this subparagraph is that the State has denied such a licensing application based (in whole or in part) on the organization's failure to meet applicable solvency requirements and -

(i) such requirements are not the same as the solvency standards established under section 1395w-26(a) of this title; or

(ii) the State has imposed as a condition of approval of the license documentation or information requirements relating to solvency or other material requirements, procedures, or standards relating to solvency that are different from the requirements, procedures, and standards applied by the Secretary under subsection (d)(2) of this section.

For purposes of this paragraph, the term "solvency requirements" means requirements relating to solvency and other matters covered under the standards established under section 1395w-26(a) of this title.

(E) Treatment of waiver

In the case of a waiver granted under this paragraph for a provider-sponsored organization with respect to a State -

(i) Limitation to State

The waiver shall be effective only with respect to that State and does not apply to any other State.

(ii) Limitation to 36-month period

The waiver shall be effective only for a 36-month period and may not be renewed.

(iii) Conditioned on compliance with consumer protection and quality standards

The continuation of the waiver is conditioned upon the organization's compliance with the requirements described in subparagraph (G).

(iv) Preemption of State law

Any provisions of law of that State which relate to the licensing of the organization and which prohibit the organization from providing coverage pursuant to a contract under this part shall be superseded.

(F) Prompt action on application

The Secretary shall grant or deny such a waiver application within 60 days after the date the Secretary determines that a substantially complete waiver application has been filed. Nothing in this section shall be construed as preventing an organization which has had such a waiver application denied from submitting a subsequent waiver application.

(G) Application and enforcement of State consumer protection and quality standards

(i) In general

A waiver granted under this paragraph to an organization with respect to licensing under State law is conditioned upon the organization's compliance with all consumer protection and quality standards insofar as such standards -

(I) would apply in the State to the organization if it were licensed under State law;

(II) are generally applicable to other Medicare+Choice organizations and plans in the State; and

(III) are consistent with the standards established under this part.

Such standards shall not include any standard preempted under section 1395w-26(b)(3)(B) of this title.

(ii) Incorporation into contract

In the case of such a waiver granted to an organization with respect to a State, the Secretary shall incorporate the requirement that the organization (and Medicare+Choice plans it offers) comply with standards under clause (i) as part of the contract between the Secretary and the organization under section 1395w-27 of this title.

(iii) Enforcement

In the case of such a waiver granted to an organization with respect to a State, the Secretary may enter into an agreement with the State under which the State agrees to provide for monitoring and enforcement activities with respect to compliance of such an organization and its Medicare+Choice plans with such standards. Such monitoring and enforcement shall be conducted by the State in the same manner as the State enforces such standards with respect to other Medicare+Choice organizations and plans, without discrimination based on the type of organization to which the standards apply. Such an agreement shall specify or establish mechanisms by which compliance activities are undertaken, while not lengthening the time required to review and process applications for waivers under this paragraph.

(H) Report

By not later than December 31, 2001, the Secretary shall submit to the Committee on Ways and Means and the Committee on Commerce of the House of Representatives and the Committee on Finance of the Senate a report regarding whether the waiver process under this paragraph should be continued after December 31, 2002. In making such recommendation, the Secretary shall consider, among other factors, the impact of such process on beneficiaries and on the long-term solvency of the program under this subchapter.

(3) Licensure does not substitute for or constitute certification

The fact that an organization is licensed in accordance with paragraph (1) does not deem the organization to meet other requirements imposed under this part.

(b) Assumption of full financial risk

The Medicare+Choice organization shall assume full financial risk on a prospective basis for the provision of the health care services for which benefits are required to be provided under section 1395w-22(a)(1) of this title, except that the organization -

(1) may obtain insurance or make other arrangements for the cost of providing to any enrolled member such

services the aggregate value of which exceeds such aggregate level as the Secretary specifies from time to time,

(2) may obtain insurance or make other arrangements for the cost of such services provided to its enrolled members other than through the organization because medical necessity required their provision before they could be secured through the organization,

(3) may obtain insurance or make other arrangements for not more than 90 percent of the amount by which its costs for any of its fiscal years exceed 115 percent of its income for such fiscal year, and

(4) may make arrangements with physicians or other health care professionals, health care institutions, or any combination of such individuals or institutions to assume all or part of the financial risk on a prospective basis for the provision of basic health services by the physicians or other health professionals or through the institutions.

(c) Certification of provision against risk of insolvency for unlicensed PSOs

(1) In general

Each Medicare+Choice organization that is a provider-sponsored organization, that is not licensed by a State under subsection (a) of this section, and for which a waiver application has been approved under subsection (a)(2) of this section, shall meet standards established under section 1395w-26(a) of this title relating to the financial solvency and capital adequacy of the organization.

(2) Certification process for solvency standards for PSOs

The Secretary shall establish a process for the receipt and approval of applications of a provider-sponsored organization described in paragraph (1) for certification (and periodic recertification) of the organization as meeting such solvency standards. Under such process, the Secretary shall act upon such a certification application not later than 60 days after the date the application has been received.

(d) "Provider-sponsored organization" defined

(1) In general

In this part, the term "provider-sponsored organization" means a public or private entity -

(A) that is established or organized, and operated, by a health care provider, or group of affiliated health care providers,

(B) that provides a substantial proportion (as defined by the Secretary in accordance with paragraph (2)) of the health care items and services under the contract under this part directly through the provider or affiliated group of providers, and

(C) with respect to which the affiliated providers share, directly or indirectly, substantial financial risk with respect to the provision of such items and services and have at least a majority financial interest in the entity.

(2) Substantial proportion

In defining what is a "substantial proportion" for purposes of paragraph (1)(B), the Secretary -

(A) shall take into account the need for such an organization to assume responsibility for providing -

(i) significantly more than the majority of the items and services under the contract under this section through its own affiliated providers; and

(ii) most of the remainder of the items and services under the contract through providers with which the organization has an agreement to provide such items and services,

in order to assure financial stability and to address the practical considerations involved in integrating the delivery of a wide range of service providers;

(B) shall take into account the need for such an organization to provide a limited proportion of the items and services under the contract through providers that are neither affiliated with nor have an agreement with the organization; and

(C) may allow for variation in the definition of substantial proportion among such organizations based on relevant differences among the organizations, such as their location in an urban or rural area.

(3) Affiliation

For purposes of this subsection, a provider is "affiliated" with another provider if, through contract, ownership, or otherwise -

(A) one provider, directly or indirectly, controls, is controlled by, or is under common control with the other,

(B) both providers are part of a controlled group of corporations under section 1563 of the Internal Revenue Code of 1986,

(C) each provider is a participant in a lawful combination under which each provider shares substantial financial risk in connection with the organization's operations, or

(D) both providers are part of an affiliated service group under section 414 of such Code.

(4) Control

For purposes of paragraph (3), control is presumed to exist if one party, directly or indirectly, owns, controls, or holds the power to vote, or proxies for, not less than 51 percent of the voting rights or governance rights of another.

(5) "Health care provider" defined

In this subsection, the term "health care provider" means -

(A) any individual who is engaged in the delivery of health care services in a State and who is required by State law or regulation to be licensed or certified by the State to engage in the delivery of such services in the State, and

(B) any entity that is engaged in the delivery of health care services in a State and that, if it is required by State law or regulation to be licensed or certified by the State to engage in the delivery of such services in the State, is so licensed.

(6) Regulations

The Secretary shall issue regulations to carry out this subsection.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1855, as added Pub. L. 105-33, title IV, Sec. 4001, Aug. 5, 1997, 111 Stat. 312.)

---

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

**42 USC § 1395w-26**

**United States Code (USC)**
**Title 42 - THE PUBLIC HEALTH AND WELFARE**
**Chapter 7 - SOCIAL SECURITY**
**42 USC § 1395w-26 Establishment of standards**

**42 USC § 1395w-26. Establishment of standards**

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Part C - Medicare+Choice Program

(a) Establishment of solvency standards for provider-sponsored organizations

(1) Establishment

(A) In general

The Secretary shall establish, on an expedited basis and using a negotiated rulemaking process under subchapter III of chapter 5 of title 5, standards described in section 1395w-25(c)(1) of this title (relating to the financial solvency and capital adequacy of the organization) that entities must meet to qualify as provider-sponsored organizations under this part.

(B) Factors to consider for solvency standards

In establishing solvency standards under subparagraph (A) for provider-sponsored organizations, the Secretary shall consult with interested parties and shall take into account -

(i) the delivery system assets of such an organization and ability of such an organization to provide services directly to enrollees through affiliated providers,

(ii) alternative means of protecting against insolvency, including reinsurance, unrestricted surplus, letters of credit, guarantees, organizational insurance coverage, partnerships with other licensed entities, and valuation attributable to the ability of such an organization to meet its service obligations through direct delivery of care, and

(iii) any standards developed by the National Association of Insurance Commissioners specifically for risk-based health care delivery organizations.

(C) Enrollee protection against insolvency

Such standards shall include provisions to prevent enrollees from being held liable to any person or entity for the Medicare+Choice organization's debts in the event of the organization's insolvency.

(2) Publication of notice

In carrying out the rulemaking process under this subsection, the Secretary, after consultation with the National Association of Insurance Commissioners, the American Academy of Actuaries, organizations representative of medicare beneficiaries, and other interested parties, shall publish the notice provided for under section 564(a) of title 5 by not later than 45 days after August 5, 1997.

(3) Target date for publication of rule

As part of the notice under paragraph (2), and for purposes of this subsection, the "target date for publication" (referred to in section 564(a)(5) of such title) shall be April 1, 1998.

(4) Abbreviated period for submission of comments

In applying section 564(c) of such title under this subsection, "15 days" shall be substituted for "30 days".

(5) Appointment of negotiated rulemaking committee and facilitator

The Secretary shall provide for -

(A) the appointment of a negotiated rulemaking committee under section 565(a) of such title by not later than 30 days after the end of the comment period provided for under section 564(c) of such title (as shortened under paragraph (4)), and

(B) the nomination of a facilitator under section 566(c) of such title by not later than 10 days after the date of appointment of the committee.

(6) Preliminary committee report

The negotiated rulemaking committee appointed under paragraph (5) shall report to the Secretary, by not later than January 1, 1998, regarding the committee's progress on achieving a consensus with regard to the rulemaking proceeding and whether such consensus is likely to occur before 1 month before the target date for publication of the rule. If the committee reports that the committee has failed to make significant progress towards such consensus or is unlikely to reach such consensus by the target date, the Secretary may terminate such process and provide for the publication of a rule under this subsection through such other methods as the Secretary may provide.

(7) Final committee report

If the committee is not terminated under paragraph (6), the rulemaking committee shall submit a report containing a proposed rule by not later than 1 month before the target date of publication.

(8) Interim, final effect

The Secretary shall publish a rule under this subsection in the Federal Register by not later than the target date of publication. Such rule shall be effective and final immediately on an interim basis, but is subject to change and revision after public notice and opportunity for a period (of not less than 60 days) for public comment. In connection with such rule, the Secretary shall specify the process for the timely review and approval of applications of entities to be certified as provider-sponsored organizations pursuant to such rules and consistent with this subsection.

(9) Publication of rule after public comment

The Secretary shall provide for consideration of such comments and republication of such rule by not later than 1 year after the target date of publication.

(b) Establishment of other standards

(1) In general

The Secretary shall establish by regulation other standards (not described in subsection (a) of this section) for Medicare+Choice organizations and plans consistent with, and to carry out, this part. The Secretary shall publish such regulations by June 1, 1998. In order to carry out this requirement in a timely manner, the Secretary may promulgate regulations that take effect on an interim basis, after notice and pending opportunity for public comment.

(2) Use of current standards

Consistent with the requirements of this part, standards established under this subsection shall be based on standards established under section 1395mm of this title to carry out analogous provisions of such section.

(3) Relation to State laws

The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

(4) Prohibition of midyear implementation of significant new regulatory requirements

The Secretary may not implement, other than at the beginning of a calendar year, regulations under this section that impose new, significant regulatory requirements on a Medicare+Choice organization or plan.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1856, as added Pub. L. 105-33, title IV, Sec. 4001, Aug. 5, 1997, 111 Stat. 317; amended Pub. L. 106-554, Sec. 1(a)(6) [title VI, Secs. 612(a), 614(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A-560; Pub. L. 108-173, title II, Sec. 232(a), Dec. 8, 2003, 117 Stat. 2208.)

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

# EXHIBIT B



VIVA MEDICARE *Plus*
MEMBER OF THE UAB HEALTH SYSTEM

Dear PEEHIP Retiree,

Have your premiums increased with your current plan? Are you having second thoughts about your healthcare coverage? Then VIVA MEDICARE *Plus* may be the plan for you.

If you are a Public Education Retiree on Medicare and eligible for PEEHIP benefits, we have a special program for you. If you want more benefits than traditional Medicare offers, **VIVA PEEHIP** with VIVA MEDICARE *Plus* is an excellent choice. Best of all, VIVA MEDICARE *Plus* has no monthly plan premium (you continue to pay your Part B premium to Medicare). VIVA MEDICARE *Plus* is offered under a contract with the federal government. We offer the following benefits:

- **No Yearly Medical Deductibles**
- **$0 Physician or Specialty Copays**
- **$0 Hospital admission or One Day Surgery Copays**
- **$0 Ambulance or Emergency Room visit Copays**
- **A Comprehensive Dental Plan through CompBenefits**
- **Prescription Drug Benefit ($12 generics, $25 preferred brands, $45 non-preferred brands up to $3000 /year)***

Plus, added benefits such as:
**$20 Towards YMCA Monthly Membership**
**$200 Allowance for Eye Glasses or Contact Lenses**
**20 free rides (10 round trips) a year for medical care**

**<u>The open enrollment for this program ends August 30, 2006!</u>** Call VIVA MEDICARE *Plus* now to receive more information about the PEEHIP option and how to enroll: (**205**) **933-8482** in Birmingham or (**888**) **830-8482**. For TTY services, call the Alabama Relay Service at (800) 548-2546. We welcome any questions you may have and we look forward to serving you.

*This applies to **VIVA PEEHIP** with VIVA MEDICARE *Plus*. VIVA MEDICARE *Plus* also offers a plan with Medicare Part D prescription drugs. Call now for more details.



VIVA MEDICARE PLUS
1400 21st Place South
Birmingham, Alabama 35205

Presort Standard
U.S. Postage
PAID
Permit #2061
Birmingham, AL

Call:
check on this!!

**********AUTO**3-DIGIT 360
Susie J Williams
14333 County Road 45
Union Springs, AL 36089-3001

9296 T30  P1

# EXHIBIT C

**42 USC § 1395w-104**

**United States Code (USC)**

**Title 42 - THE PUBLIC HEALTH AND WELFARE**

**Chapter 7 - SOCIAL SECURITY**

**42 USC § 1395w-104 Beneficiary protections for qualified prescription drug coverage**

## 42 USC § 1395w-104. Beneficiary protections for qualified prescription drug coverage

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Part D - Voluntary Prescription Drug Benefit Program

subpart 1 - part d eligible individuals and prescription drug benefits

(a) Dissemination of information

(1) General information

(A) Application of MA information

A PDP sponsor shall disclose, in a clear, accurate, and standardized form to each enrollee with a prescription drug plan offered by the sponsor under this part at the time of enrollment and at least annually thereafter, the information described in section 1395w-22(c)(1) of this title relating to such plan, insofar as the Secretary determines appropriate with respect to benefits provided under this part, and including the information described in subparagraph (B).

(B) Drug specific information

The information described in this subparagraph is information concerning the following:

(i) Access to specific covered part D drugs, including access through pharmacy networks.

(ii) How any formulary (including any tiered formulary structure) used by the sponsor functions, including a description of how a part D eligible individual may obtain information on the formulary consistent with paragraph (3).

(iii) Beneficiary cost-sharing requirements and how a part D eligible individual may obtain information on such requirements, including tiered or other copayment level applicable to each drug (or class of drugs), consistent with paragraph (3).

(iv) The medication therapy management program required under subsection (c) of this section.

(2) Disclosure upon request of general coverage, utilization, and grievance information

Upon request of a part D eligible individual who is eligible to enroll in a prescription drug plan, the PDP sponsor offering such plan shall provide information similar (as determined by the Secretary) to the information described in subparagraphs (A), (B), and (C) of section 1395w-22(c)(2) of this title to such individual.

(3) Provision of specific information

(A) Response to beneficiary questions

Each PDP sponsor offering a prescription drug plan shall have a mechanism for providing specific information on a timely basis to enrollees upon request. Such mechanism shall include access to information through the use of a toll-free telephone number and, upon request, the provision of such information in writing.

(B) Availability of information on changes in formulary through the Internet

A PDP sponsor offering a prescription drug plan shall make available on a timely basis through an Internet website information on specific changes in the formulary under the plan (including changes to tiered or preferred status of covered part D drugs).

(4) Claims information

A PDP sponsor offering a prescription drug plan must furnish to each enrollee in a form easily understandable to such enrollees -

(A) an explanation of benefits (in accordance with section 1395b-7(a) of this title or in a comparable manner); and

(B) when prescription drug benefits are provided under this part, a notice of the benefits in relation to -

(i) the initial coverage limit for the current year; and

(ii) the annual out-of-pocket threshold for the current year.

Notices under subparagraph (B) need not be provided more often than as specified by the Secretary and notices under subparagraph (B)(ii) shall take into account the application of section 1395w-102(b)(4)(C) of this title to the extent practicable, as specified by the Secretary.

(b) Access to covered part D drugs

(1) Assuring pharmacy access

(A) Participation of any willing pharmacy

A prescription drug plan shall permit the participation of any pharmacy that meets the terms and conditions under the plan.

(B) Discounts allowed for network pharmacies

For covered part D drugs dispensed through in-network pharmacies, a prescription drug plan may, notwithstanding subparagraph (A), reduce coinsurance or copayments for part D eligible individuals enrolled in the plan below the level otherwise required. In no case shall such a reduction result in an increase in payments made by the Secretary under section 1395w-115 of this title to a plan.

(C) Convenient access for network pharmacies

(i) In general

The PDP sponsor of the prescription drug plan shall secure the participation in its network of a sufficient number of pharmacies that dispense (other than by mail order) drugs directly to patients to ensure convenient access (consistent with rules established by the Secretary).

(ii) Application of TRICARE standards

The Secretary shall establish rules for convenient access to in-network pharmacies under this subparagraph that are no less favorable to enrollees than the rules for convenient access to pharmacies included in the statement of work of solicitation (#MDA906-03-R-0002) of the Department of Defense under the TRICARE Retail Pharmacy (TRRx) as of March 13, 2003.

(iii) Adequate emergency access

Such rules shall include adequate emergency access for enrollees.

(iv) Convenient access in long-term care facilities

Such rules may include standards with respect to access for enrollees who are residing in long-term care facilities and for pharmacies operated by the Indian Health Service, Indian tribes and tribal organizations, and urban Indian organizations (as defined in section 1603 of title 25).

(D) Level playing field

Such a sponsor shall permit enrollees to receive benefits (which may include a 90-day supply of drugs or biologicals) through a pharmacy (other than a mail order pharmacy), with any differential in charge paid by such enrollees.

(E) Not required to accept insurance risk

The terms and conditions under subparagraph (A) may not require participating pharmacies to accept insurance risk as a condition of participation.

(2) Use of standardized technology

(A) In general

The PDP sponsor of a prescription drug plan shall issue (and reissue, as appropriate) such a card (or other technology) that may be used by an enrollee to assure access to negotiated prices under section 1395w-102(d) of this title.

(B) Standards

(i) In general

The Secretary shall provide for the development, adoption, or recognition of standards relating to a standardized format for the card or other technology required under subparagraph (A). Such standards shall be compatible with part C of subchapter XI of this chapter and may be based on standards developed by an appropriate standard setting organization.

(ii) Consultation

In developing the standards under clause (i), the SecretaRy shall consult with the National Council for Prescription Drug Programs and other standard setting organizations determined appropriate by the Secretary.

(iii) Implementation

The Secretary shall develop, adopt, or recognize the standards under clause (i) by such date as the Secretary determines shall be sufficient to ensure that PDP sponsors utilize such standards beginning January 1, 2006.

(3) Requirements on development and application of formularies

If a PDP sponsor of a prescription drug plan uses a formulary (including the use of tiered cost-sharing), the following requirements must be met:

(A) Development and revision by a pharmacy and therapeutic (P&T) committee

(i) In general

The formulary must be developed and reviewed by a pharmacy and therapeutic committee. A majority of the members of such committee shall consist of individuals who are practicing physicians or practicing pharmacists (or both).

(ii) Inclusion of independent experts

Such committee shall include at least one practicing physician and at least one practicing pharmacist, each of whom -

(I) is independent and free of conflict with respect to the sponsor and plan; and

(II) has expertise in the care of elderly or disabled persons.

(B) Formulary development

In developing and reviewing the formulary, the committee shall -

(i) base clinical decisions on the strength of scientific evidence and standards of practice, including assessing peer-reviewed medical literature, such as randomized clinical trials, pharmacoeconomic studies, outcomes research data, and on such other information as the committee determines to be appropriate; and

(ii) take into account whether including in the formulary (or in a tier in such formulary) particular covered part D drugs has therapeutic advantages in terms of safety and efficacy.

(C) Inclusion of drugs in all therapeutic categories and classes

(i) In general

The formulary must include drugs within each therapeutic category and class of covered part D drugs, although not necessarily all drugs within such categories and classes.

(ii) Model guidelines

The Secretary shall request the United States Pharmacopeia to develop, in consultation with pharmaceutical benefit managers and other interested parties, a list of categories and classes that may be used by prescription drug plans under this paragraph and to revise such classification from time to time to reflect changes in therapeutic uses of covered part

D drugs and the additions of new covered part D drugs.

(iii) Limitation on changes in therapeutic classification

The PDP sponsor of a prescription drug plan may not change the therapeutic categories and classes in a formulary other than at the beginning of each plan year except as the Secretary may permit to take into account new therapeutic uses and newly approved covered part D drugs.

(D) Provider and patient education

The PDP sponsor shall establish policies and procedures to educate and inform health care providers and enrollees concerning the formulary.

(E) Notice before removing drug from formulary or changing preferred or tier status of drug

Any removal of a covered part D drug from a formulary and any change in the preferred or tiered cost-sharing status of such a drug shall take effect only after appropriate notice is made available (such as under subsection (a)(3) of this section) to the Secretary, affected enrollees, physicians, pharmacies, and pharmacists.

(F) Periodic evaluation of protocols

In connection with the formulary, the sponsor of a prescription drug plan shall provide for the periodic evaluation and analysis of treatment protocols and procedures.

The requirements of this paragraph may be met by a PDP sponsor directly or through arrangements with another entity.

(c) Cost and utilization management; quality assurance; medication therapy management program

(1) In general

The PDP sponsor shall have in place, directly or through appropriate arrangements, with respect to covered part D drugs, the following:

(A) A cost-effective drug utilization management program, including incentives to reduce costs when medically appropriate, such as through the use of multiple source drugs (as defined in section 1396r-8(k)(7)(A)(i) of this title).

(B) Quality assurance measures and systems to reduce medication errors and adverse drug interactions and improve medication use.

(C) A medication therapy management program described in paragraph (2).

(D) A program to control fraud, abuse, and waste.

Nothing in this section shall be construed as impairing a PDP sponsor from utilizing cost management tools (including differential payments) under all methods of operation.

(2) Medication therapy management program

(A) Description

(i) In general

A medication therapy management program described in this paragraph is a program of drug therapy management that may be furnished by a pharmacist and that is designed to assure, with respect to targeted beneficiaries described in clause (ii), that covered part D drugs under the prescription drug plan are appropriately used to optimize therapeutic outcomes through improved medication use, and to reduce the risk of adverse events, including adverse drug interactions. Such a program may distinguish between services in ambulatory and institutional settings.

(ii) Targeted beneficiaries described

Targeted beneficiaries described in this clause are part D eligible individuals who -

(I) have multiple chronic diseases (such as diabetes, asthma, hypertension, hyperlipidemia, and congestive heart failure);

(II) are taking multiple covered part D drugs; and

(III) are identified as likely to incur annual costs for covered part D drugs that exceed a level specified by the Secretary.

(B) Elements

Such program may include elements that promote -

(i) enhanced enrollee understanding to promote the appropriate use of medications by enrollees and to reduce the risk of potential adverse events associated with medications, through beneficiary education, counseling, and other appropriate means;

(ii) increased enrollee adherence with prescription medication regimens through medication refill reminders, special packaging, and other compliance programs and other appropriate means; and

(iii) detection of adverse drug events and patterns of overuse and underuse of prescription drugs.

(C) Development of program in cooperation with licensed pharmacists

Such program shall be developed in cooperation with licensed and practicing pharmacists and physicians.

(D) Coordination with care management plans

The Secretary shall establish guidelines for the coordination of any medication therapy management program under this paragraph with respect to a targeted beneficiary with any care management plan established with respect to such beneficiary under a chronic care improvement program under section 1395b-8 of this title.

(E) Considerations in pharmacy fees

The PDP sponsor of a prescription drug plan shall take into account, in establishing fees for pharmacists and others providing services under such plan, the resources used, and time required to, implement the medication therapy management program under this paragraph. Each such sponsor shall disclose to the Secretary upon request the amount of any such management or dispensing fees. The provisions of section 1396r-8(b)(3)(D) of this title apply to information disclosed under this subparagraph.

(d) Consumer satisfaction surveys

In order to provide for comparative information under section 1395w-101(c)(3)(A)(v) of this title, the Secretary shall conduct consumer satisfaction surveys with respect to PDP sponsors and prescription drug plans in a manner similar to the manner such surveys are conducted for MA organizations and MA plans under part C of this subchapter.

(e) Electronic prescription program

(1) Application of standards

As of such date as the Secretary may specify, but not later than 1 year after the date of promulgation of final standards under paragraph (4)(D), prescriptions and other information described in paragraph (2)(A) for covered part D drugs prescribed for part D eligible individuals that are transmitted electronically shall be transmitted only in accordance with such standards under an electronic prescription drug program that meets the requirements of paragraph (2).

(2) Program requirements

Consistent with uniform standards established under paragraph (3) -

(A) Provision of information to prescribing health care professional and dispensing pharmacies and pharmacists An electronic prescription drug program shall provide for the electronic transmittal to the prescribing health care professional and to the dispensing pharmacy and pharmacist of the prescription and information on eligibility and benefits (including the drugs included in the applicable formulary, any tiered formulary structure, and any requirements for prior authorization) and of the following information with respect to the prescribing and dispensing of a covered part D drug:

(i) Information on the drug being prescribed or dispensed and other drugs listed on the medication history, including information on drug-drug interactions, warnings or cautions, and, when indicated, dosage adjustments.

(ii) Information on the availability of lower cost, therapeutically appropriate alternatives (if any) for the drug prescribed.

(B) Application to medical history information

Effective on and after such date as the Secretary specifies and after the establishment of appropriate standards to carry out this subparagraph, the program shall provide for the electronic transmittal in a manner similar to the manner under subparagraph (A) of information that relates to the medical history concerning the individual and related to a covered part D drug being prescribed or dispensed, upon request of the professional or pharmacist involved.

(C) Limitations

Information shall only be disclosed under subparagraph (A) or (B) if the disclosure of such information is permitted under the Federal regulations (concerning the privacy of individually identifiable health information) promulgated under section 264(c) of the Health Insurance Portability and Accountability Act of 1996.

(D) Timing

To the extent feasible, the information exchanged under this paragraph shall be on an interactive, real-time basis.

(3) Standards

(A) In general

The Secretary shall provide consistent with this subsection for the promulgation of uniform standards relating to the requirements for electronic prescription drug programs under paragraph (2).

(B) Objectives

Such standards shall be consistent with the objectives of improving -

(i) patient safety;

(ii) the quality of care provided to patients; and

(iii) efficiencies, including cost savings, in the delivery of care.

(C) Design criteria

Such standards shall -

(i) be designed so that, to the extent practicable, the standards do not impose an undue administrative burden on prescribing health care professionals and dispensing pharmacies and pharmacists;

(ii) be compatible with standards established under part C of subchapter XI of this chapter, standards established under subsection (b)(2)(B)(i) of this section, and with general health information technology standards; and

(iii) be designed so that they permit electronic exchange of drug labeling and drug listing information maintained by the Food and Drug Administration and the National Library of Medicine.

(D) Permitting use of appropriate messaging

Such standards shall allow for the messaging of information only if it relates to the appropriate prescribing of drugs, including quality assurance measures and systems referred to in subsection (c)(1)(B) of this section.

(E) Permitting patient designation of dispensing pharmacy

(i) In general

Consistent with clause (ii), such standards shall permit a part D eligible individual to designate a particular pharmacy to dispense a prescribed drug.

(ii) No change in benefits

Clause (i) shall not be construed as affecting -

(I) the access required to be provided to pharmacies by a prescription drug plan; or

(II) the application of any differences in benefits or payments under such a plan based on the pharmacy dispensing

a covered part D drug.

(4) Development, promulgation, and modification of standards

(A) Initial standards

Not later than September 1, 2005, the Secretary shall develop, adopt, recognize, or modify initial uniform standards relating to the requirements for electronic prescription drug programs described in paragraph (2) taking into consideration the recommendations (if any) from the National Committee on Vital and Health Statistics (as established under section 242k(k) of this title) under subparagraph (B).

(B) Role of NCVHS

The National Committee on Vital and Health Statistics shall develop recommendations for uniform standards relating to such requirements in consultation with the following:

(i) Standard setting organizations (as defined in section 1320d(8) of this title)

(ii) Practicing physicians.

(iii) Hospitals.

(iv) Pharmacies.

(v) Practicing pharmacists.

(vi) Pharmacy benefit managers.

(vii) State boards of pharmacy.

(viii) State boards of medicine.

(ix) Experts on electronic prescribing.

(x) Other appropriate Federal agencies.

(C) Pilot project to test initial standards

(i) In general

During the 1-year period that begins on January 1, 2006, the Secretary shall conduct a pilot project to test the initial standards developed under subparagraph (A) prior to the promulgation of the final uniform standards under subparagraph (D) in order to provide for the efficient implementation of the requirements described in paragraph (2).

(ii) Exception

Pilot testing of standards is not required under clause (i) where there already is adequate industry experience with such standards, as determined by the Secretary after consultation with effected standard setting organizations and industry users.

(iii) Voluntary participation of physicians and pharmacies

In order to conduct the pilot project under clause (i), the Secretary shall enter into agreements with physicians, physician groups, pharmacies, hospitals, PDP sponsors, MA organizations, and other appropriate entities under which health care professionals electronically transmit prescriptions to dispensing pharmacies and pharmacists in accordance with such standards.

(iv) Evaluation and report

(I) Evaluation

The Secretary shall conduct an evaluation of the pilot project conducted under clause (i).

(II) Report to Congress

Not later than April 1, 2007, the Secretary shall submit to Congress a report on the evaluation conducted under subclause (I).

(D) Final standards

Based upon the evaluation of the pilot project under subparagraph (C)(iv)(I) and not later than April 1, 2008, the Secretary shall promulgate uniform standards relating to the requirements described in paragraph (2).

(5) Relation to State laws

The standards promulgated under this subsection shall supersede any State law or regulation that -

(A) is contrary to the standards or restricts the ability to carry out this part; and

(B) pertains to the electronic transmission of medication history and of information on eligibility, benefits, and prescriptions with respect to covered part D drugs under this part.

(6) Establishment of safe harbor

The Secretary, in consultation with the Attorney General, shall promulgate regulations that provide for a safe harbor from sanctions under paragraphs (1) and (2) of section 1320a-7b(b) of this title and an exception to the prohibition under subsection (a)(1) of section 1395nn of this title with respect to the provision of nonmonetary remuneration (in the form of hardware, software, or information technology and training services) necessary and used solely to receive and transmit electronic prescription information in accordance with the standards promulgated under this subsection -

(A) in the case of a hospital, by the hospital to members of its medical staff;

(B) in the case of a group practice (as defined in section 1395nn(h)(4) of this title), by the practice to prescribing health care professionals who are members of such practice; and

(C) in the case of a PDP sponsor or MA organization, by the sponsor or organization to pharmacists and pharmacies participating in the network of such sponsor or organization, and to prescribing health care professionals.

(f) Grievance mechanism

Each PDP sponsor shall provide meaningful procedures for hearing and resolving grievances between the sponsor (including any entity or individual through which the sponsor provides covered benefits) and enrollees with prescription drug plans of the sponsor under this part in accordance with section 1395w-22(f) of this title.

(g) Coverage determinations and reconsiderations

(1) Application of coverage determination and reconsideration provisions

A PDP sponsor shall meet the requirements of paragraphs (1) through (3) of section 1395w-22(g) of this title with respect to covered benefits under the prescription drug plan it offers under this part in the same manner as such requirements apply to an MA organization with respect to benefits it offers under an MA plan under part C of this subchapter.

(2) Request for a determination for the treatment of tiered formulary drug

In the case of a prescription drug plan offered by a PDP sponsor that provides for tiered cost-sharing for drugs included within a formulary and provides lower cost-sharing for preferred drugs included within the formulary, a part D eligible individual who is enrolled in the plan may request an exception to the tiered cost-sharing structure. Under such an exception, a nonpreferred drug could be covered under the terms applicable for preferred drugs if the prescribing physician determines that the preferred drug for treatment of the same condition either would not be as effective for the individual or would have adverse effects for the individual or both. A PDP sponsor shall have an exceptions process under this paragraph consistent with guidelines established by the Secretary for making a determination with respect to such a request. Denial of such an exception shall be treated as a coverage denial for purposes of applying subsection (h) of this section.

(h) Appeals

(1) In general

Subject to paragraph (2), a PDP sponsor shall meet the requirements of paragraphs (4) and (5) of section 1395w-22 (g) of this title with respect to benefits (including a determination related to the application of tiered cost-sharing described in subsection (g)(2) of this section) in a manner similar (as determined by the Secretary) to the manner such requirements apply to an MA organization with respect to benefits under the original medicare fee-for-service program option it offers under an MA plan under part C of this subchapter. In applying this paragraph only the part D eligible individual shall be entitled to bring such an appeal.

(2) Limitation in cases on nonformulary determinations

A part D eligible individual who is enrolled in a prescription drug plan offered by a PDP sponsor may appeal under paragraph (1) a determination not to provide for coverage of a covered part D drug that is not on the formulary under the plan only if the prescribing physician determines that all covered part D drugs on any tier of the formulary for treatment of the same condition would not be as effective for the individual as the nonformulary drug, would have adverse effects for the individual, or both.

(3) Treatment of nonformulary determinations

If a PDP sponsor determines that a plan provides coverage for a covered part D drug that is not on the formulary of the plan, the drug shall be treated as being included on the formulary for purposes of section 1395w-102(b)(4)(C)(i) of this title.

(i) Privacy, confidentiality, and accuracy of enrollee records

The provisions of section 1395w-22(h) of this title shall apply to a PDP sponsor and prescription drug plan in the same manner as it applies to an MA organization and an MA plan.

(j) Treatment of accreditation

Subparagraph (A) of section 1395w-22(e)(4) of this title (relating to treatment of accreditation) shall apply to a PDP sponsor under this part with respect to the following requirements, in the same manner as it applies to an MA organization with respect to the requirements in subparagraph (B) (other than clause (vii) thereof) of such section:

(1) Subsection (b) of this section (relating to access to covered part D drugs).

(2) Subsection (c) of this section (including quality assurance and medication therapy management).

(3) Subsection (i) of this section (relating to confidentiality and accuracy of enrollee records).

(k) Public disclosure of pharmaceutical prices for equivalent drugs

(1) In general

A PDP sponsor offering a prescription drug plan shall provide that each pharmacy that dispenses a covered part D drug shall inform an enrollee of any differential between the price of the drug to the enrollee and the price of the lowest priced generic covered part D drug under the plan that is therapeutically equivalent and bioequivalent and available at such pharmacy.

(2) Timing of notice

(A) In general

Subject to subparagraph (B), the information under paragraph (1) shall be provided at the time of purchase of the drug involved, or, in the case of dispensing by mail order, at the time of delivery of such drug.

(B) Waiver

The Secretary may waive subparagraph (A) in such circumstances as the Secretary may specify.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1860D-4, as added Pub. L. 108-173, title I, Sec. 101(a)(2), Dec. 8, 2003, 117 Stat. 2082.)

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

# EXHIBIT D

**42 USC § 1395**

**United States Code (USC)**

**Title 42 - THE PUBLIC HEALTH AND WELFARE**

**Chapter 7 - SOCIAL SECURITY**

**42 USC § 1395 Prohibition against any Federal interference**

---

**42 USC § 1395. Prohibition against any Federal interference**

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1801, as added Pub. L. 89-97, title I, Sec. 102(a), July 30, 1965, 79 Stat. 291.)

---

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

# EXHIBIT E

**42 USC § 1395b**

**United States Code (USC)**

Title 42 - THE PUBLIC HEALTH AND WELFARE

Chapter 7 - SOCIAL SECURITY

42 USC § 1395b Option to individuals to obtain other health insurance protection

## 42 USC § 1395b. Option to individuals to obtain other health insurance protection

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Nothing contained in this subchapter shall be construed to preclude any State from providing, or any individual from purchasing or otherwise securing, protection against the cost of any health services.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1803, as added Pub. L. 89-97, title I, Sec. 102(a), July 30, 1965, 79 Stat. 291.)

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

# EXHIBIT F



VIVA MEDICARE *Plus*
MEMBER OF THE UAB HEALTH SYSTEM

April 13, 2007

Ms. Susie Williams
c/o L. Cooper Rutland, Jr.
Rutland Law Firm, L.L.C.
208 North Prairie Street
Post Office Box 551
Union Springs, Alabama 36089

Re: Your VIVA Health coverage

Dear Ms. Williams:

VIVA Health has recently learned that the benefits of your VIVA Medicare Plus Select ("VIVA Medicare") and your VIVA Health plan for PEEHIP retirees might not have been what you anticipated. There may have been some confusion concerning the plan's coverage maximum for prescription drugs and coverage for syringes. There also may be some confusion about your dis-enrolling. At VIVA Health, we take pride in our customer service and we want to do whatever might be reasonable to assist you.

First, effective October 1, 2006, you completed two separate enrollment applications for membership in two separate VIVA Health plans. The primary plan, VIVA Medicare, is a Medicare Advantage plan offered by VIVA Health under a contract with the Centers for Medicare & Medicaid Services ("CMS"). The secondary plan is the plan VIVA Health offers to PEEHIP retirees, which enhances the benefits of VIVA Medicare by eliminating member out-of-pocket costs on covered medical services, adding coverage for dental services and eyewear, and adding a prescription drug benefit.

According to our records, you disenrolled from VIVA Medicare effective November 30, 2006. VIVA Health assumes that you returned to original Medicare for your Medicare benefits. Dis-enrollment from the secondary plan, VIVA Health for PEEHIP, is controlled through PEEHIP. PEEHIP's rules govern when you can dis-enroll. In addition, Blue Cross Blue Shield of Alabama would have to agree to allow you to enroll in its plan, or you would not have PEEHIP coverage. VIVA Health cannot enroll you into Blue Cross PEEHIP coverage. To date, we have not received instructions from PEEHIP to dis-enroll you, but will do so as soon as such instructions are received. Generally, changes to PEEHIP coverage are made at open enrollment, which begins in the late summer for an October 1, 2007 effective date.

As to the prescription drug maximum, the prescription drug benefit offered under the VIVA Health plan for PEEHIP retirees does have a $3,000 maximum per calendar year. This maximum is stated in VIVA Health's marketing materials (including the original letter you received from VIVA Health making you aware of this plan). This limit is also included in the

1222 14th Avenue South, Birmingham, Alabama 35205
Phone (205) 918-2067 • 1-800-633-1542
For TTY Services: Call Alabama Relay at (800) 548-2546
Our office hours are Monday through Friday from 8:00 am to 5:00 pm

rider to the Evidence of Coverage you received at enrollment and again in early November as part of our annual mailing describing the additional benefits of enrolling in the VIVA Health plan for PEEHIP retirees. Our call documentation does not reflect that you have called concerning this prescription drug maximum.

Our records do not indicate that you have been impacted by this prescription drug maximum. You did not reach the maximum in 2006. The maximum reset on January 1, 2007, providing an additional $3,000 in benefit. You have not yet exhausted this amount in 2007.

Based on your misunderstanding of the coverage maximum and the importance of your medications to managing your medical conditions, VIVA Health will waive for you the $3,000 maximum for prescription drugs for your medical conditions until October 1, 2007. On October 1, 2007, you may change your coverage with PEEHIP back to the Blue Cross plan for retirees, if that plan better suits your needs, or you may continue with VIVA Health PEEHIP coverage for retirees with the annual $3,000 prescription drug maximum (unless this benefit changes for the next plan year), like other VIVA Health PEEHIP retiree participants.

As with the prescription drug coverage, our records do not indicate that you have had any claims for syringes that have not been paid. Unfortunately, Medicare does not allow Medicare Advantage plans that do not include Medicare Part D, like VIVA Medicare, to cover syringes. However, syringes are 100% covered on your VIVA Health PEEHIP plan from participating diabetic suppliers. To assist you, VIVA Health will also cover syringes under the VIVA Health plan for PEEHIP retirees prescription benefit so that you may get them at a participating pharmacy at no cost to you until October 1, 2007. If you have paid out of pocket for syringes before you brought this issue to our attention, please send us the receipts or other documentation letting us know what you have spent and VIVA Health will reimburse you.

VIVA Health's plans have grievance and complaint procedures, which can be initiated by calling us. Our records do not indicate that you submitted any complaint verbally or in writing as to any of the above issues. VIVA Health is always glad to attempt to resolve any issue you might have over the telephone. If you are not satisfied, though, with any aspect of your VIVA Health coverage, please submit something in writing, which should help resolve any issues.

VIVA Health regrets if our plans did not meet your expectations. Again, we will waive the $3,000 prescription drug coverage maximum and allow you to secure syringes through a participating pharmacy at no cost until October 1, 2007, your next opportunity to change your PEEHIP plan. We trust you will find these accommodations reasonable. Please contact me at (205) 558-7575 if you have any questions related to this letter.

Sincerely yours,

Latrina Hicks
Manager of Medicare Member Services
VIVA Health Inc.

# EXHIBIT G

STATE OF ALABAMA

COUNTY OF BULLOCK

## **AFFIDAVIT**

Before me, the undersigned, a Notary Public in and for said County, State of Alabama, first appeared Thomas Main and being duly sworn did depose and say

My name is Thomas Main.

I am a pharmacist with Main Drug Store in Union Springs, Alabama. I am intimately familiar with Susie Williams prescription problems. She has been a customer of mine for several years. It was brought to my attention that Susie Williams had been removed from her PEEHIP retirement health and prescription drug plan and placed in a plan administered by VIVA Health Care, Inc. It was determined that the prescription program would not be sufficient to provide Mrs. Williams with her needed insulin as there was a $3,000.00 cap on their drug program. I contacted VIVA Medicare Plus on at least seven occasions and spoke to different employees of VIVA to try and correct the problem. I was unsuccessful and was advised by VIVA Medicare officials that Mrs. Williams prescription coverage would run out at $3,000.00. I was also told by Fred, an employee of VIVA Medicare Plus, that they had enrolled Mrs. Williams in the wrong program and should have placed her in their PEEHIP Plan with the VIVA Medicare Plus RX which would have taken care of her needs. I have attached transcripts of phone conversations I had with VIVA officials at various times during the last four months. These are true and correct transcripts of recordings of those conversations.

Further affiant saith not.

_____
Thomas Main, Pharmacist
Main Drug Store

Sworn to and subscribed before me this the 25th day of April 2007.

_____
Notary Public
Commission Expires 7-15-2010

Transcription-1

**VIVA REP** - Thanks for holding, I am showing her in not the Care Mart but our regular system is showing that she is no longer on the PHIP plan but she is using a regular VIVA Medicare plus card?

**Main** - That's what it appears sir, yes sir and it did work today, so.

**VIVA rep** - Hmm, okay, yea cause I am still showing her open on a Care Mart but I am not showing her enrolled on our plan. I don't know how she is still using that card.

**Main** - It is kind of strange, I agree with you and I don't mean and the lady at PHIP said she did all she could do to get her put back on with you. I don't know if there is something.

**VIVA rep** - I am not even showing her on our plan but it still have her open up in our Care Mart system.

**Main** - Correct - so you do show her active in that Care Mart system?

**VIVA rep** -Yea but she is not active in our regular system.

**Main** - Yes sir - Well I mean, I guess anyway my question was does on her Care Mart benefits do you know what - does she have a cap there or I mean will that work.

**VIVA rep** - But the thing is in order for her to be in Care Mart, she has to be on our drug plan but if it is not showing her effective with VIVA coverage, then she can't use that card.

**Main** - Right - then what do we need to do for her I mean, tell me where we need to go with her actually.

**VIVA rep** - Okay hold on one moment

**Main** - No problem.

**VIVA** - Okay

**Main** - And so you will see where she got left out where she got left in the last week or two you know when she was dis-enrolled with VIVA, she was left out in the cold without any drug coverage and so you know the lady at PHIP was trying to get her, I thought, back in the PHIP but at the end she was actually putting her back in the VIVA.

**VIVA** - Okay hold on.

**VIVA rep** - Sir?

**Main** - Yes sir.

**VIVA** - Thank you for holding.

**Main** - No problem - I appreciate your help.

**VIVA** - Okay, to be honest with you - by her not being on the VIVA plan.

**Main** - Yes sir.

**VIVA** - She was taken off of PHIP back in November.

**Main** - Yes sir.

**VIVA** - She does not have benefits.

**Main** - Okay.

**VIVA** - But VIVA - we need to close her out in Care Mart - uhm and she is still open in Care Mart so actually she does not have any benefits with VIVA.

**Main** - Okay - so I guess what does that mean - she is not supposed to be getting the drugs, basically, is that what it means?

**VIVA** - Yea, she doesn't supposed to be using that card.

**Main** - Right, they just have not closed her out yet?

**VIVA** - Right, they just haven't closed her out yet in Care Mart

**Main** - Alright, I got'cha - is that something that you haven't updated yet?

**VIVA** - I am going to have to check with our — policy department and make sure that they closed it out because they still had her open in Care Mart.

**Main** - Alright well then sir when you are asking them about it tell them the pharmacists sold them last week and all that and I was doing the exact same thing and it would not work and it was like she did not work and it was like she was actually cut out like you are saying and then uh we have been working with that lady at the PHIP and she was telling she has got it cut on or something and then it did work so there may be something going on behind the scenes, there, I don't.

**VIVA** - Yea, there.

**Main** - Right that you or me both don't know about, just so you will know sir.

**VIVA** - Do you know who the person is at PHIP?

**Main** - Yes, I do actually and I can give you their name and extension and name and everything.

**VIVA** - Okay.

**Main** - You got a pen?

**VIVA** - Yes sir.

**Main** - This is at PHIP office - you dial 800-214-2158 extension, I believe you dial 1 454 and her name is Kathy Green and she has talked with Ms Susie and you know she has been working with this for the last day or two or whatever, you know, and apparently she is working with somebody, the last I was told she, you know, I talked with her about an hour ago and she was telling me that she did get it cut back on with VIVA or something like that and it did work so apparently she does.

**VIVA** - I need to find, I don't know if we received the application showing that she was put back on the plan.

**Main** - Right

**VIVA** - And now I am showing her just enrolled as of November 30 but we still have her open in Care Mart.

**Main** - Right I gotta'cha.

**VIVA** - So I just need to find - your name.

**Main** - My name is Thomas Main M-a-i-n and I am at Main Drug store - Let me give you my phone number

**VIVA** - Okay.

**Main** - 334-738-2020 - I have been trying to help Ms Susie with this since awhile back, I tell you she, its on - not to bash anybody, we have a lot of reps that for some reason go door to door down here and they just - I am going to be straight up with you - they tell these patients that it is absolutely free - nothing will change, sign here and that is exactly what the man told her - Her drugs run about $8,000 a year and this drug plan that he signed her up on has a cap of apparently about $3,000.

**VIVA** -  ----- right, they have a $3,000 cap on the — plan - she shouldn't even - well you know what -

**Main** - Sir, she is a diabetic, her medicine is outrageous and she is poor, we are down here in

Bullock County, she can't afford this medicine, she is going to make it a couple of months and boom she is going to have to pay $5,000 or she is not going to have it so I am trying to head it off and it is a disaster.

**VIVA** - Okay.

**Main** - And I tell you where we are trying - I hit right when she signed up you know I researched it all because I had it happen to a bunch of patients and you know we were informed actually misinformed that if we got her out before the new year because it was the Part D enrollment period, in November or December, that she would be okay and so we did a dis-enrollment with VIVA so that she could go back to the PHIP and that is when I ran into the road block and just yesterday and today you know that the PHIP wouldn't take her back, they were saying it had to be done, you know, in a different time period but.

**VIVA** - Yes.

**Main** - Anyway, she the poor lady is in a pickle there

**VIVA** - You would think that they should have enrolled her in was — they could have enrolled her in VIVA Medicare Plus PHIP plan for on our RX drug plan because she is going to spend more than $3,000.

**Main** - Oh yea, absolutely.

**VIVA** - They just had her signed up on the wrong plan - she should have, they should have signed her up on our PHIP plan but under VIVA Medicare Plus RX drug plan -

**Main** - Gottacha - then after she would have had maybe a donut hole or something.

**VIVA** - Right right - and then it would have kicked in.

**Main** - Right absolutely but uh this is the worse case actually.

**VIVA** - Okay - let me call Kathy Green.

**Main** - Okay.

**VIVA** - And see what I can find out on her end and then uh - we can go from there and I can call you back once I kinda of figure out what is going on with.

**Main** - Okay actually, let me give you Ms Susie Williams', she is as sweet as she can be, she just got taken advantage of, let me give you her phone number, Ms Susie, what is your home phone number - 334 -485-3304 .

**VIVA** - Okay.

**Main** - And sir what is your name?

**VIVA** - My name is Fred.

**Main** - Okay Fred she has got a little book she is trying to keep going - I am going to write in - I have told her - cause we've got a bunch of Humana reps and everybody going door to door down here knocking on doors so I am going to tell her she can talk to Fred at VIVA cause you are not - you know you are trying to help her, okay.

**VIVA** - Okay.

**Main** - Cause uh, just so you know, cause we have them going door to door down here signing people up or whatever, but anyway, anyway Fred if you can help us out on that it would be great, okay.

**VIVA** - Okay thank you.

**Main** - Appreciate it Fred - Fred do you have a particular extension number at.

**VIVA** - Yes, it is 542.

**Main** - 542.

**VIVA** - Yes.

**Main** - Thank you Fred.

**VIVA** - Your welcome bye bye.

**Transcription - 2**

**Main** - You still there Ma'am.

**unidentified** - Yes.

**Main** - Okay anyway I have had this happen to so many people right then I knew she was in trouble so what I tried to figure out what her benefits were and we found out she had the $3,000 maximum so what we are trying to do is call PHIP and since there is like uh an enrollment period for the medicare part B plan in November and December, we were under the impression in talking to PHIP that if she would dis-enroll from VIVA she could you know she could re-enroll in the PHIP so we dis-enrolled her from VIVA in November and then uh you know we tried to get her back in PHIP and that is where we ran into a problem and as of a few days ago she wasn't in VIVA but the PHIP people have gotten her back into the VIVA, if that makes any

**unidentified** - And they just notified us yesterday.

**Main** - Right exactly so but the whole thing we were trying to get her back to PHIP cause, bless her heart, she is a diabetic, she doesn't have any money whatsoever, she barely makes it month to month on the co-pays with express scripts and by being in this plan automatically she is going to have to pay out of pocket about a $------ so we were trying our best to help her out and that is where we are, you know what I mean, cause if not, she is going to make it two or three months on these co-pays, you know and then she is going to be left out in the cold kinda if that makes any sense

**unidentified** - Yea, I understand and I don't - I unfortunately not the person who is going to help you with that because, I mean, we had her originally under PHIP I mean from the get go.

**Main** - Right.

**unidentified** - And that was one event that was going through everything with Express Script and had nothing to do with VIVA.

**Main** - Right that is exactly right because it didn't have a max it was her retirement insurance.

**unidentified** - Right and I mean that's so out of norm for me, I mean I don't have any idea about any of that.

**Main** - Right

**unidentified** - We just get our information from PHIP and we had her from October to the end of November under PHIP under her Medicare and effective as of yesterday they told us that effective back to 12-1 she was under one of her PHIP retiree benefits

**Main** - Right.

**Unidentified** - Umm, I don't know how I know what you are asking but I don't know how to go about getting that done.

**Main** - Right right

**Unidentified** - I don't even know who she would need to talk to about I mean, I don't know.

**Main** - Alright well I mean I guess my biggest question was that right now the way she signed up with y'all, she's gonna run out at $3,000 right.

**Unidentified** - Yes sir, I mean -------

**Main** - Well, that's really what I was trying to clarify for her because .

**Unidentified** - Okay

**Main** - Because the biggest thing was we are trying to prepare her for the upcoming whenever she hits that $3,000 because I don't know you know what I mean, she does not fully understand .

**Unidentified** - What's coming up?

**Main** - Right - how bad it's going to be because you know she is a diabetic on insulin and stuff like that she can't afford and once she doesn't take that she will end up in the hospital so I am trying my best to help her out you know.

**Unidentified** - She may want to contact somebody at PHIP.

**Main** - Well that's who we have been dealing with, in fact I talked to them several times over the past several months and they told us they couldn't let her back in PHIP since she was in the VIVA, that if we dis-enrolled her from the VIVA that you know they could pick her back up and now I'm finding out that they wouldn't do that they are saying that this particular type plan will only allow her to move in August or July if that makes sense, that's new to me but

**Unidentified** - Okay, I don't.

**Main** - But any way Ma'am I appreciate it - I appreciate your help.

**Unidentified** - I am sorry.

**Main** - What's your name Ma'am?

**Unidentified** - Stacey.

**Main** - Tracey -do you have an extension?

**Unidentified** - Stacey

**Main** - Stacey, I'm sorry do you have an extension number or anything that I can reach you at.

**Stacey** - I'm actually in Pharmacy thought, I don't - I can give you my number but I can give you another number also,

**Main** - Let me get yours first.

**Stacey** - 558

**Main** - 518

**Stacey** - 558 - I'm sorry you are breaking up.

**Main** - Okay go ahead.

**Stacey** - 7205.

**Main** - And that's area code 205.

**Stacey** - Yes Sir, area code 205 - 558-7551.

**Main** - do you have an extension.

**Stacey** - That's my direct line.

**Main** - okay.

**Stacey** - And also, let me give you this other number -1-800-294-7780 and that's my customer service and they may be able to help you more on the benefit side with her.

**Main** - Okay but you are with VIVA not Care Mart correct.

**Stacey** - Right I'm with VIVA yes Sir.

**Main** - Alright no problem I just wanted to make sure and like I said just - bless her heart you see where I am coming from she.

**Stacey** - Oh, I know.

**Main** - Okay thank you Ms Stacey.

**Stacey** - Its great that you are willing to do that for her and your willing to help.

**Main** - Well I am trying to, bless her heart, she is sweet as she can be and it's going to be a disaster for her and you know I'll tell you we have had so many reps down here from VIVA signing people up like this and they don't tell them anything and you know they just say it's no problem just sign here and then they end up you know.

**Stacey** - I'm not familiar with that because my understanding was I mean I didn't I thought they came straight from PHIP and I might ask somebody about it because I was not aware that our fellows was doing that .

**Main** - I have had another rep from VIVA to tell me that today so I actually clearly verified with the patient by sitting down with her that the person did come to her house and he did say nothing would change absolutely nothing would change when he signed her up so just for your knowledge or whatever - alright thank you Ma'am.

**Stacey** - What was your name?

**Main** - My name is Thomas Main I'm the pharmacist here at Main Drug Store and my number is 334 - you know you got my number.

**Stacey** - Okay - I am going to ask around and see if I can find out anything myself and I'll let you know if I do.

**Main** - Thank you Stacey cause like I said I mean right now she is okay because she is getting her medicine but you know two or three months - bless her heart she is going to be in trouble Thank you Ma'am.

**Stacey** - Okay thank you.

Transcription - 3

**Answering Machine** - Hi, this is Angie ----- at VIVA Health and Pharmacy, I'm here im just away from my desk or on another line.  Please leave your name, number, and a brief message and I will return your call as soon as possible.

**Main** - Mrs. Isabel(Angie), this is Thomas Main, a Pharmacists calling from Main Drug Store in Union Springs.  I have got one of your patients, Mrs. Susie J. Williams, umm, her member number is 0020973600, we are having a issue with her drug coverage.  She was signed up by a VIVA representative.  Anyway, if you could, please call me bak at 334-738-2020 and ask for Thomas Main.  We needed some help with Mrs. Susie's situation if you could.

**Transcription - 4**

**Daphne** - Thank you for calling VIVA Medicare Plus, Daphne speaking, for quality purposes, can I have you member number please.

**Main** - Daphne, my name is Thomas Main and I am a Pharmacists calling from Main Drug Store, let me give you the ID number for the patient I am calling about.

**Daphne** - Ok

**Main** - Its going to be 419505603 for Mrs. Susie J. Williams 523.

**Daphne** - Ok, what can I help you with?

**Main** - Well Ma'am, Mrs Susie had been signed up on a VIVA Medicare Plan that had like a maximum on her drugs and she got a new member number and card and ummm I was just trying to make sure and see what her benefits were at this time.

**Daphne** - No Sir, for that, lets see now, it wouldn't be , lets see, ok VIVA Medicare Plus, perhaps maybe she has a different number because I am showing that she is no longer with us at this time.

**Main** - Ok, let me give you a new number that she got that is not on your card, it's a new member number, ok it's 0020973600.

**Daphne** - Ok, that is not ours.

**Main** - Alright

**Daphne** - -------let me see

**Main** - Well, I filled a prescription today and it went through on the, you know, it went through today so.

**Daphne** - Hold on for me just a minute for me, she just dis-enrolled with us on the 11/30

**Main**- Ok, thank you

**Daphne** - Your welcome

**Daphne** -  Sir?

**Main** - Yes Ma'am

**Daphne** - Ok, let me give you the correct telephone and the correct department to call and I

apologize for that.

**Main** - Ok Ma'am, hold on one second, let me get a pen, just a second ok, im sorry hang on just a second.......ok Ma'am, im sorry, go right ahead with that number

**Daphne** - 1-800-294-7780.

**Main** - Thank you.

**Daphne** - Ok sir, you have a good day.


## Transcription - 4a

**Latondra** - Viva health, this is Latondre, how can I help you?

**Main** - Yes Ma'am, my name is Thomas Main, a Pharmacists calling from Main Drug Store, and Ma'am I've got one of your patients I was trying to help with her VIVA medicare plan and I was trying to see if you could help us with something Ma'am.

**Latondra** - Ok, she is a medicare member.

**Main** - Yes Ma'am, she is right here, would you like to speak to her?

**Latondra** - Hold on, let me transfer you to VIVA Medicare Plus.

**Main** - Alright Ma'am this is a prescription issue, is that still where you need to send me?

**LaTondra** - Yes sir, hold for a moment.


## Transcription - 4b

**Answering Machine** - Thank you for calling VIVA Medicare Plus, all representatives are currently assisting other callers, your call is very important yo us, please hold and your call will be answered by the next available representative.  Your call may be recorded for quality purposes.

**Charlotte** - Thank you for calling VIVA Medicare Plus, this is Charlotte, for security purposes may I have your member ID number.

**Main** - Ms. Charlotte, my name is Thomas Main, I am a Pharmacists calling from Main Drug store and I am trying to help a patient with her Part D plan, or actually, VIVA Medicare Plan, if you could help us out with that.

**Charlotte** - Ok, spell your last name Thomas

**Main** - M-A-I-N

**Charlotte** - Ok, and the members Social Security Number.

**Main** - I have a Social Security Number or either her member number, which ever one.

**Charlotte** - It should be the same, the member has two zeros at the end.

**Main** - Ok, ummm, let me pull it right back up, hold on just a second.

**Charlotte** - What is her name?

**Main** - Susie J. Williams, and that VIVA medicare number I have is 4019505603 and I also have a new number but I was going to ask you, Mrs Susie is a teachers retiree and she was actually signed up for Medicare, we tried, when they signed her up, they signed her up for a drug plan that had a maximum cost that they would pay upwards to about $5,000.00, im not sure of the exact figure, and we were trying to get her converted to her past retirement on the express scripts or at least get her one of the Part D Plans that didn't have the maximum allowable on her medicine.

**Charlotte** - Just a moment please.

**Main** - Ok

**Charlotte** - I see that she dis-enrolled with us 11/30/06.

**Main** - Well I am filling prescriptions for her today and they are going through, umm.

**Charlotte** - Because she has PEHIP.

**Main** - But now, VIVA is paying me for it and I just didn't know and she is saying that she talked to a *Mr. Richard Brannon at VIVA, I talked to him earlier, and I have another member number that she was given, can I give you that number and see if it shows anything?

**Charlotte** - Ok, please.

**Main** - Its 0020973600.

**Charlotte** - Just a moment please.

**Main** - Alright, thank you Ma'am

**Charlotte** - Ok, I see that the new number has her under PEHIP retired and.

**Main** - Mostly I am just trying to help her with her drug coverage, she is a diabetic Ma'am and her drugs run about $8,000.00 - $10,000.00 per year and the was she was initially signed up with VIVA, they were telling me they actually had a maximum of $5,000.00, which would leave her owing upwards of $3,000.00 to $5,000.00 per year as long as nothing changed this year, and you know, she does not have that and the representative that came to her house and signed her up promised her nothing would change, but you know, its going to be pretty devastating for her, so we have really been trying to help her the best we could, and I have talked to numerous people and I just wanted to follow up with her and see if you can make a change.

**Charlotte** - Ok, let me check on something.

**Charlotte** - Sir, I just talked to umm, Blue Cross carries her prescription and coverage.

**Main** - So, are they , is this a new plan, for example, whenever they have Blue Cross Blue Shield of Alabama they have express scripts also that actually is ind of subcontracted out from the Blue Cross or whatever.

**Charlotte** - I don't know how Blue Cross works sir, I'm sorry.

**Main** - Ok let me just try right quick, of you have got just a second, to make sure, because they had that Blue Cross Policy terminated when she signed up with VIVA, let me actually try a claim on their just so we will both know actually, if you will hang on just a second, because they may have cut her back on, no they actually have disconnected that, they have canceled that from her so as far as your knowledge, she does not  have drug coverage, is that right?

**Charlotte** - Ok, see she is not in our Care Mart system.

**Main** - Right.

**Charlotte** - But are drugs going through?

**Main** - Yes Ma'am that is what I am saying, I filled her insulin today and it went through and I have got the plan set up as VIVA that paid e for it and I can give you ...

**Charlotte** - Hold on just a moment and I can look and see if its going under her Social Security Number.

**Main** - Yes it is actually, that is the ID number I am using is her Social Security Number.

**BREAK IN RECORDING**

**Charlotte**: She is going to wind up having to pay for that because that particular.

**Main** - Because you know usually, with every other insurance company I have had this problem with, they update it right quick in their computer and I am concerned because it goes through fine in my end.

**Charlotte** - It shows there is no coverage on this screen either from her Social Security Number,

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, is that correct?

**Main** -Yes Ma'am, and is their anyway to access the system im looking at.

**Charlotte** - Care Mart.

**Main** - Yes Ma'am, like to verify because I don't know if yall need to send an update to them.

**Charlotte** - You see im ummm, pulled it up by her social security number and there is not anything coming up.

**Main** - Really? See I am transmitting, see I don't know if you know about that VIN number I'm using is 610029 with a process control number of CRK.

**Charlotte** - Hang on just a second ok.

**Main** - No problem.

**Charlotte** - Sir, I'm sorry, what has happed is her drugs are going in under her old coverage with us which is under the Social Security Number, they need to be going under the new number with is kind of a commercial type of coverage, and what I am going to have to  is call and get they to change that in the system.

**Main** - Ok so she does have coverage, is that correct?

**Charlotte**  - As far as I know she does, but I don't know, can I have you phone number and let me call them.

**Main** - Sure no problem, the number is 334-738-2020, and there is no way to look up in your system and just tell us what her benefits are.

**Charlotte** - No.

**Main** - But yall tell the other company what to cover, correct.

**Charlotte** - Right, let me call they real fast and I will give you a call right back.

**Main** - Alright, and what was your name again Ma'am.

**Charlotte** - Charlotte.

**Main** - Charlotte, do you have an extension number

**Charlotte** - No, but I will be calling you right back.

**Main** - Ok.

**Charlotte** - Bye Bye.

**Transcription - 5**

**Main** - Main Drug Store, may I help you?

**Tanja** - This is Sandra with VIVA Medicare Plus.

**Main** - Yes Ma'am Mrs Sandra

**Tanja** - You were trying to get that ultra fine, the needles and the syringes.

**Main** - Ok.

**Tanja** - Ok now the lances, test strips and the syringes come from a DME company, she can not get those through the pharmacy.

**Main** - Ok, that is no problem Ma'am and actually I just ran that recheck to get the phone numbers and information, we actually had a different issue with this patient, when she was signed up for VIVA Medicare, she used to have the teachers retirement through Blue Cross Blue Shield of Alabama, and somebody came to her home and signed her up for VIVA, and when they did that initially, they had signed her up for a VIVA plan that had like a cap on how much medicine she could get and that what I was trying to check and see, we have tried our best to get that cap lifted or get her converted to a different type of plan and what we were actually trying to do today was to just have someone look in the computer and verify that she had unlimited amount of money that could be spent on her medications, if that makes any sense, she is a diabetic, her medications run about $8,000.00 to $10,000.000 per year and on that new plan they had signed her up on is had a cap of $5,000.00 give or take a little bit I don't remember the exact figure, but the bottom line was, she was going to be in big trouble, so we were trying to get that resolved and she came back today and I was just trying to call and see what the current status of her drug plan is.

**Tanja** - Ok, so you are trying to get her converted to something else.

**Main** - Well we were actually not trying to do anything, we just wanted to know today was she listed there with a like, was she still on this drug plan that had the max amount of money that can be spent.

**Tanja** - Correct, that is the one she is still on.

**Main** - She is still on that, and what is the cap because I am trying to help her with her medications so we can do what she really needs and we may have to switch something because she is going to have to make it the whole year on that limited amount of money that yall will pay, and I didn't know, what is that cap.

**Tanja** - One moment.

**Main** - Ok, thank you.

**Tanja** - Ok, thanks for waiting.

**Main** - Yes no problem.

**Tanja** - The cap is for $3,000.00 .

**Main** - $3,000.00 maximum.

**Tanja** - Um hum.

**Main** - Alright, you understand where the problem is for her there, and Ma'am what was your name again.

**Tanja** - T-A-N-J-A

IN THE U.S. DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSIE WILLIAMS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:07-CV-00321-WKW-TFM |
| VS | ) | |
| | ) | |
| VIVA HEALTH, INC. | ) | |
| and RICKY CRAPP | ) | |
| | ) | |
| Defendant. | ) | |

---

### PLAINTIFF'S MOTION TO REMAND

---

**COMES NOW** the Plaintiff, Susie Williams, by and through her undersigned counsel of record, and moves this honorable Court to remand this case to the Circuit Court of Bullock County, Alabama, from which is was improperly removed by Defendants. In support of this motion, Plaintiff shows unto the Court as follows:

1.    On March 13, 2007  Plaintiff, a resident of Bullock County, Alabama filed a complaint against Viva Health Inc. and Ricky Crapp in the Circuit Court of Bullock County, Alabama. Plaintiff's claims against the Defendant in the State Court action consists of the following State Law claims: (1) Negligent Procurement, (2) Negligence, (3) Wantonness, (4) Outrage, (5) Breach of Contract, (6) Negligent Hiring, Training and Supervision.

2.    On April 12, 2006 Defendant Viva Health Inc. Improperly removed the State Court action from the Circuit Court of Bullock County to this Court pursuant to § 28 U.S.C. 1446. Defendant Viva's argument for removal rest on the contention that Plaintiff state law claims are completely pre-empted by the Medicare Act / MMA.

3.      It is well-settled that removal must be based on the existence of a Federal District Court's original jurisdiction of a State Court action. See 28 U.S.C. § 1441(a); *Caterpillar, Inc. v Williams 482 U.S. 386, 319-392, (1987).* Defendant bears the burden of establishing this Court's subject matter jurisdiction. *Laughlin v Prudential Insurance Company 882 F. 2nd 187, 190 (5th Circuit 1989): B. Inc. 663 F. 2nd at 549; Lowe v Ingall's Shipbuilding, 723 F. 2nd 1137, 1177 citing Epps v Bexar-Medina-Atascossa Counties Water Improvement District No. 1 665 F. 2nd 594, 595 (5th Circuit 1982).* If Federal jurisdiction is even "doubtful" this case must be remanded, *Williams v Tri-County Community Center 323 F. Supplement 286, 288 (SD Miss. 1971)* A defendant may remove a state Court action to Federal Court only if the action could have been originally filed in Federal Court, *Caterpiller Inc. v Williams 482 U.S. 386, 391-391 (1987)*

4.      This Court lacks federal question jurisdiction. Plaintiffs have asserted only state law claims. Defendant Viva has the burden of demonstrating that a substantial question of Federal Law is necessary to the resolution of Plaintiff's claims. *Franchise Tax Board v Construct Laborers Vacation Trust 463 U. S. 1, 103 Supreme Court 2841, 2846 77 Law Ed. 2nd 420 (1983); Kidd v Southeast Airlines 891 F. 2nd 540, 542-543 (5th Circuit 1990) First National Reserve L.C. v Vaughn 931 F. Supp. 463, 468 (E. D. Tex 1996); Rogers v Modern Woodmen of America 1997 W. L. 206757, *4 (N. D. Miss 1997).* The fact that a state law claim related to a federal issue, or involves an interpretation of a federal law, does not necessarily establish a federal question and provide removal jurisdiction. *Merrell Dow Pharmaceutical Inc. v Thompson 478 U.S. 804, 106 Supreme Court 3229 (1986).*

5.      It is well established law that the Medicare Statutory provisions do not provide for "complete preemption". *Burke v Humana Insurance Company 1995 W.L. 841678 *2 (M. D.,*

*Ala). Grace v Interstate Life & Accident Insurance Company 816 F. Supplement 1185, 1191*

*(M.D. Ala 1996)*

6.   Defendant Viva's arguments can only be described as specious and wholly without merit.

7.   Plaintiff offers their memorandum of law in support of remand and request the defendant be made to pay Plaintiff's Attorney's fees and cost associated with defending this improper removal to Federal Court.

Wherefore, Plaintiff requests this honorable Court remand this case to the Circuit Court for Bullock County, Alabama without delay, as Plaintiff is elderly and worried sick about getting her insurance straight. Plaintiff request Attorney's fees and cost for this improper removal pursuant to 28 U.S.C. § 1447(c).

Plaintiff by counsel:

/s/ L. Cooper Rutland, Jr.
L. Cooper Rutland, Jr.(RUT010)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSIE WILLIAMS, | ) | |
| Plaintiff, | ) | |
| vs | ) | 2:07-CV-00321-WKW-TFM |
| VIVA HEALTH, INC. and | ) | |
| RICKY CRAPP | ) | |
| Defendant. | ) | |

### CERTIFICATE OF SERVICE

I hereby certify that on the ___25th___ day of ___April___ 2007, I electronically filed

the foregoing Plaintiff's Motion to Remand with the Clerk of the Court using the CM/ECF system

which will send notification of such filing to the following CM/ECF participants:


James S. Christie, Jr. Esq.
Amelia T. Driscoll, Esq.
Bradley Arant Rose & White LLP
1819 Fifty Avenue North
Birmingham, AL 35203-2104


                              __/s/ L. Cooper Rutland, Jr._____
                              L. Cooper Rutland, Jr. (RUT010)
                              Rutland Law LLC
                              208 North Prairie Street
                              Post Office Box 551
                              Union Springs, Alabama 36089

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSIE WILLIAMS, | ) | |
| Plaintiff, | ) | |
| vs | ) | 2:07-CV-00321-WKW-TFM |
| VIVA HEALTH, INC. and | ) | |
| RICKY CRAPP | ) | |
| Defendant. | ) | |

---

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF
## MOTION TO REMAND

---

**COMES NOW** the Plaintiff by and through her undersigned counsel of record, and offers this Memorandum of Law in Support of her Motion to Remand filed contemporaneously herewith.

### INTRODUCTION

Plaintiff filed this case against Viva Health, Inc. (Hereinafter "Viva") and Ricky Crapp, their agent, in the Circuit Court of Bullock County, Alabama, on March 13, 2007. Plaintiff's complaint brings state law claims asserting that Defendants were negligent in the procurement of medical insurance for Plaintiff, negligent in handling her dis-enrollment, committed acts that were wanton, outrageous, breached their contract with Plaintiff and were negligent in their hiring, training, and supervision of Defendant, Crapp. Defendant Viva and Crapp have exposed Plaintiff to health care costs that were covered under her Public Education Employees Health Insurance Plan (PEEHIP). This has upset Plaintiff greatly as she is an insulin dependent diabetic whose medical costs far exceed the "credible coverage" offered by Defendant.

This case is before the Court as a result of Viva's improper removal pursuant to 28 U.S.C.

§1446. At its core, Defendant relies on the argument that Plaintiff's state law claims, are completely preempted by federal law, that is, the Medicare Act/MMA. Defendant, Viva is misleading the Court by picking out sections of the MMA and claiming they cover Title 42 in its entirety. It is well settled law from this district that the Medicare Act/MMA does not "preempt the field" and as such this Court lacks federal question jurisdiction.

ARGUMENT

I. <u>Plaintiff's claims have not invoked federal question jurisdiction</u>.

No issues of federal law are raised on the face of the Plaintiff's complaint and no relief premised on federal law is sought from this Court or the State Court.

A defendant may remove a civil action from State Court to Federal Court provided that the Federal Court has original jurisdiction over the Plaintiff's claims. 28 U.S.C.§1441(a). The propriety of the Defendant's removal on federal question grounds depends upon whether any of the Plaintiff's claims arise under federal law, thereby giving this Court original federal question jurisdiction over the claims. 28 U.S.C.§1331. "The district court shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."

Whether a claim arises under federal law so as to confer federal question jurisdiction under 28 U.S.C.§1331, is governed by the "well-pleaded complaint" rule, which provides that "federal jurisdiction exists only when a federal question is presented on the face of the Plaintiff's properly pleaded complaint." *Caterpillar v Williams*. 482 U.S. 386,392,107 S.Ct. 2425, 2429, 96C. Ed 2d 318 (1987) Because the "well-pleaded complaint" rule provides for the determination of jurisdiction solely on the basis of the Plaintiff's complaint, the rule makes the Plaintiff master of the claim and federal jurisdiction may be avoided by exclusive reliance on state law. *Caterpillar* id at 392

The Plaintiff in the instant action brought only state law claims. None of the relief sought

by Plaintiff is preempted by federal law.  The complaint specifically states:

> **Plaintiff brings all claims under applicable Alabama statutes and makes no
> claims which would in any way invoke federal jurisdiction**.  (See Complaint
> Paragraph 6 attached as part of Exhibit 1 to Defendant's Notice of Removal).

Federal question jurisdiction arises when a Plaintiff sets forth allegations "founded on a claim

or right arising under the Constitution, treaties or laws of the United States 28 U.S.C. §1441(b).

Utilizing the "well-pleaded complaint" rule, if on its face the complaint raises no issue of federal

law, then, federal question jurisdiction is lacking.  *Franchise Tax Bd v Laborers Vacation Trust* 463

U.S. 1, 10, 103 S.Ct. 2841, 77L. Ed. 2d 420 (1983).  Rather than admit no federal claims were made,

Defendants assert that this Court has federal question jurisdiction based on (a) preemption of state

law by the MMA and (b) the claims involve a "substantial disputed area of federal law" or a

necessary "embedded" element of the claim.  (See Defendant's Notice of Removal Paragraph 12).

    II.  The Medicare Act/MMA does not provide for "complete preemption"

Defendants in an attempt to deceive this Court make a rather specious argument regarding

the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA's) preemption

of state law.

Defendant first begin by taking a partial quote from 42 U.S.C.§1395w-26(b)(3) regarding

preemption of state law.  Plaintiff has attached the entire text of §1395w-26 as well as the text from

42 U.S.C.§1395w-25 (see Exhibit A).  The Court will note that §1395W-25 directs that Medicare

+Choice Programs (like Viva) are organized and licensed under state law.  (See (a) emphasis added.)

Then §1395w-25 makes exceptions for provider sponsored organizations allowing them to avoid

state licensing and establishes federal standards that supercede state law in this specific area. [See

(E)(iv)] 42 U.S.C. 1395w-26 (which Defendant claims is authority for field preemption). §1395w-26

establishes solvency standards for provider-sponsored organizations. §1395-w-26 C (a)(1)(A)

references the previous §1395w-25.Clearly if Defendant had bothered to read the entire statute, they would have known that the intent was to preempt the states regarding rules that govern the qualifications of "provider sponsored organizations" and nothing more. Defendants urge the Court to "look at the statutory framework, structure and purpose of the statute as a whole" to find preemption. Defendants attempt to use the *Code of Federal Regulations* to rehash their argument regarding 42 U.S.C.§1395w-26 (Both the CFR and USC section refer to solvency standards of Medicare + Choice Providers and nothing else)[1] Defendants try to spin the complaint to fit their argument by claiming they were following the law and could not "cherry pick" or health screen Mrs. Williams.

Plaintiff has made no claim that involves Defendant's marketing materials. Defendant's knew Plaintiff had health insurance through "PEEHIP". Defendant's first letter to Plaintiff evidences that knowledge. (see Exhibit B)

VIVA was well aware of Plaintiff's health insurance and instead of comparing her present coverage to what she would be getting through VIVA, Defendant assured her she would get better coverage for less money. Helping the Plaintiff make an informed decision about changing insurance is not what "cherry picking" is all about and Defendants know this.[2]

Plaintiff is not trying to circumvent the MMA and none of Plaintiff's state law claims are contrary to the standards or restricts the government's ability to carry out the requirements of the MMA. 42U.S.C.§1395w-104 dealing with medical drug benefit programs Part (D)(5)(A) and (B) relative to state laws only supercede state law that:

---

[1] Defendants make cite references to the *Federal Register* without parenthetical cites to the CFR indicating the rule or regulation was entered into the *Code of Federal Regulations*.

[2] It's ironic to Plaintiff that Defendant is so adverse to "cherry picking" customers yet so enthusiastic when "cherry picking" statutes from the MMA to support their removal of this case.

(A) is contrary to the standards or restricts the ability to carry out this part; and

(B) pertains to the electronic transmission of medication history and of information on eligibility, benefits and prescriptions with respect to covered Part D drugs under this part. (See Exhibit C at Page 10)

For the sake of demonstrating how absurd Defendants' arguments are Plaintiff would point out that pursuant to 42 U.S.C. §1395, this Court is prohibited from interfering in this case.

> "Nothing in this sub-chapter shall be construed to authorize <u>any federal officer or employee</u> to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided... or to exercise any supervision or control over the administration or operation of any such institution, agency or person." 42 U.S.C. §1395

Based on the language contained herein, no one in the federal government's employ can tell Defendant how to administer its business to its customers (see Exhibit D).

In 42 U.S.C. §1395(b) the law states that "nothing in the MMA shall preclude any state from providing, protection against the cost of any health service." Clearly, corporate greed and fraud, the type exhibited by Defendant, Viva, contributes to the high cost of health care to which the federal government gives states free reign to deal with as they see fit. (see Exhibit E)

The point is, there is no intent on the part of Congress to preempt state law simply because Medicare is involved. "Congress' intent to preempt state law may be explicitly stated in the language of federal statute or implicitly contained in the structure and purpose of the statute. *Jones v Rath Packing Co.* 430 U.S. 519, 525 97 S. Ct. 1305, 51L. Ed 2d 604 (1977).

The Supreme Court has identified three types of preemptions (1)Express (2) field, and (3) conflict. *This That and The Other Gift & Tobacco, Inc..v Cobb County, GA.*, 285 F. 3d 1319, 1322 (11th Cir 2002) "Express" preemption occurs when Congress has manifested its intent to preempt

state law explicitly in the language of the statute. If Congress does not explicitly preempt state law, however, preemption still occurs when federal regulations in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it; this is known as "field preemption" or "occupying the field." *English v General Electric Co.* 496 U.S. 72, 79, 110 S.Ct 2270 2277 110 L. Ed 2d 65 (1990) "Conflict preemption" arises when it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law." *Crosby v National Foreign Trade Council*, 530 U.S. 363, 372-73, 120 S.Ct 2228, 2294, 147 L. Ed 2d 352 (2000)

True, there are instances where Congress has preempted state law regarding certain parts of the MMA. However, Plaintiff has provided other portions of the MMA where state law is only partially preempted and in other areas given wide latitude to protect its citizens. Clearly, Congress has not "occupied the field" when it comes to the Medicare Act. Lastly, Defendants have offered no evidence that Plaintiff's state law claims make it impossible to carry out the federal rules or that state and federal laws are in conflict on this issue.

Plaintiff has no claim for Medicare benefits that have been denied her. She, therefore, has no reason to go through an administrative hearing. Plaintiff sued VIVA because they negligently screwed up her insurance.[3] Defendants claim they would have paid her bill anyway. This was not the answer given Plaintiffs pharmacist when he tried to assist Plaintiff in getting this mess straightened out. See Affidavit of Thoms Main (Exhibit G) §405 of the Social Security Act as it relates to 42 U.S.C. §1395ii has no relevance to Plaintiff's claims. Defendants' attempt to select portions of the MMA and claim complete preemption are feeble. It is clear from just the few

---

[3]Defendants after being hailed into Court for their wrongdoing try to "put the money back in the Bank" after they got caught (see Defendants' letter to Plaintiff Exhibit F).

sections Plaintiff has provided that Congress has never intended to "occupy the field" with regard to the Medicare Act. "The touchstone of the Federal District Courts removal jurisdiction is...the intent of Congress." *Burke v Humana Insurance Co.*, 1995 WL841678 2-3 (MD Ala)

The Court in *Burke* determined that although the statutory provisions regarding Medicare are extensive, "they are not sufficiently similar to the Civil enforcement and jurisdictional provisions in the LMRA and ERISA id.[4]

Again in *Grace v Interstate Life & Accident Ins. Co.*, 916F. Supp. 1185, 1191 (M.D. Ala. 1996) Defendants removed the case contending the Plaintiff's claims gave rise to federal question jurisdiction because they involved "an analysis of benefits provided under Medicare and Medicaid." Defendant VIVA makes a similar claim of "embedded" issues in this case. The Court remanded *Grace* citing the lack of preemption in *Burke*. Given the holdings in Grace and Burke by this Court, this case is due to be remanded to the Circuit Court.

    III. <u>Plaintiff is entitled to expenses and attorneys fees as a result of Defendants Removal</u>

With full knowledge that case law from the Middle District of Alabama holds the MMA does not provide federal question jurisdiction, Defendant VIVA removed this case from state court relying on a very deceptive and specious argument to claim federal preemption of all claims that in any way relate to the Medicare Act. Defendants have acted in bad faith in trying to use sections of the federal law that have no application to any of the facts in this case to claim federal preemption. Defendants try to twist the pleadings by giving self-serving interpretations of what the complaint says. Plaintiff has utilized the "well-pled complaint" rule to make all parties aware that she makes

---

[4]The Supreme Court has found "complete preemption of state law claims exist in only a few rare instances, i.e. §301 of the Labor Management Relations Act of 1947 and §502 of the Employee Retirement Income Security Act of 1974" *Burke v Humana* 1995 WL841678 2-3 (MD Ala)

no claims that would invoke federal jurisdiction yet Defendants still removed this case. Defendants cannot provide any objectively reasonable basis for removing this matter. Therefore, Plaintiffs are entitled to an award of "just costs and any actual expenses, including attorneys' fees incurred as a result of the removal pursuant to 28 U.S.C. § 1447(c)

CONCLUSION

Defendant VIVA has failed to meet its burden of demonstrating that a substantial question of federal law is necessary to the resolution of Plaintiff's claims. Defendants' arguments that Plaintiff's state law claims are "completely preempted" by the MMA are spurious, rife with half truths and offered with the intent to mislead this Court. For those reasons, this case should be remanded to the Circuit Court of Bullock County, Alabama, and the Plaintiff should be awarded attorney's fees and cost pursuant to 28 U.S.C. §1447. Defendants' conduct in this removal is to delay Plaintiff's claims. Mrs. Williams is old and has serious medical conditions which Defendants can exploit in the same way they take advantage of the elderly and infirm. Plaintiff requests with all due respect, that this Honorable Court take haste in remanding this case as its resolution is critical to Plaintiff's health and physical well being.

Plaintiff, by Counsel

/s/ L. Cooper Rutland, Jr.
L. Cooper Rutland, Jr. (RUT010)

OF COUNSEL:

Rutland Law, L.L.C.
Post Office Box 551
208 North Prairie Street
Union Springs, AL 36089
334-738-4770
lcrj@ustconline.net

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSIE WILLIAMS, | ) | |
| Plaintiff, | ) | |
| vs | ) | 2:07-CV-00321-WKW-TFM |
| VIVA HEALTH, INC. and RICKY CRAPP | ) ) | |
| Defendant. | ) | |

CERTIFICATE OF SERVICE

I hereby certify that on the ___25th___ day of ___April___ 2007, I electronically filed the foregoing Plaintiff's Memorandum of Law in Support of Motion to Remand with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

James S. Christie, Jr. Esq.
Amelia T. Driscoll, Esq.
Bradley Arant Rose & White LLP
1819 Fifty Avenue North
Birmingham, AL 35203-2104

　/s/ L. Cooper Rutland, Jr.　
L. Cooper Rutland, Jr.  (RUT010)
Rutland Law LLC
208 North Prairie Street
Post Office Box 551
Union Springs, Alabama 36089

# EXHIBIT A

## 42 USC § 1395w-25

### United States Code (USC)

**Title 42 - THE PUBLIC HEALTH AND WELFARE**

**Chapter 7 - SOCIAL SECURITY**

**42 USC § 1395w-25 Organizational and financial requirements for Medicare+Choice organizations; provider-sponsored organizations**

**42 USC § 1395w-25. Organizational and financial requirements for Medicare+Choice organizations; provider-sponsored organizations**

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Part C - Medicare+Choice Program

(a) Organized and licensed under State law

(1) In general

Subject to paragraphs (2) and (3), a Medicare+Choice organization shall be organized and licensed under State law as a risk-bearing entity eligible to offer health insurance or health benefits coverage in each State in which it offers a Medicare+Choice plan.

(2) Special exception for provider-sponsored organizations

(A) In general

In the case of a provider-sponsored organization that seeks to offer a Medicare+Choice plan in a State, the Secretary shall waive the requirement of paragraph (1) that the organization be licensed in that State if -

(i) the organization files an application for such waiver with the Secretary by not later than November 1, 2002, and

(ii) the Secretary determines, based on the application and other evidence presented to the Secretary, that any of the grounds for approval of the application described in subparagraph (B), (C), or (D) has been met.

(B) Failure to act on licensure application on a timely basis

The ground for approval of such a waiver application described in this subparagraph is that the State has failed to complete action on a licensing application of the organization within 90 days of the date of the State's receipt of a substantially complete application. No period before August 5, 1997, shall be included in determining such 90-day period.

(C) Denial of application based on discriminatory treatment

The ground for approval of such a waiver application described in this subparagraph is that the State has denied such a licensing application and -

(i) the standards or review process imposed by the State as a condition of approval of the license imposes any material requirements, procedures, or standards (other than solvency requirements) to such organizations that are not generally applicable to other entities engaged in a substantially similar business, or

(ii) the State requires the organization, as a condition of licensure, to offer any product or plan other than a Medicare+Choice plan.

(D) Denial of application based on application of solvency requirements

With respect to waiver applications filed on or after the date of publication of solvency standards under section 1395w-26(a) of this title, the ground for approval of such a waiver application described in this subparagraph is that the State has denied such a licensing application based (in whole or in part) on the organization's failure to meet applicable solvency requirements and -

(i) such requirements are not the same as the solvency standards established under section 1395w-26(a) of this title; or

(ii) the State has imposed as a condition of approval of the license documentation or information requirements relating to solvency or other material requirements, procedures, or standards relating to solvency that are different from the requirements, procedures, and standards applied by the Secretary under subsection (d)(2) of this section.

For purposes of this paragraph, the term "solvency requirements" means requirements relating to solvency and other matters covered under the standards established under section 1395w-26(a) of this title.

(E) Treatment of waiver

In the case of a waiver granted under this paragraph for a provider-sponsored organization with respect to a State -

(i) Limitation to State

The waiver shall be effective only with respect to that State and does not apply to any other State.

(ii) Limitation to 36-month period

The waiver shall be effective only for a 36-month period and may not be renewed.

(iii) Conditioned on compliance with consumer protection and quality standards

The continuation of the waiver is conditioned upon the organization's compliance with the requirements described in subparagraph (G).

(iv) Preemption of State law

Any provisions of law of that State which relate to the licensing of the organization and which prohibit the organization from providing coverage pursuant to a contract under this part shall be superseded.

(F) Prompt action on application

The Secretary shall grant or deny such a waiver application within 60 days after the date the Secretary determines that a substantially complete waiver application has been filed. Nothing in this section shall be construed as preventing an organization which has had such a waiver application denied from submitting a subsequent waiver application.

(G) Application and enforcement of State consumer protection and quality standards

(i) In general

A waiver granted under this paragraph to an organization with respect to licensing under State law is conditioned upon the organization's compliance with all consumer protection and quality standards insofar as such standards -

(I) would apply in the State to the organization if it were licensed under State law;

(II) are generally applicable to other Medicare+Choice organizations and plans in the State; and

(III) are consistent with the standards established under this part.

Such standards shall not include any standard preempted under section 1395w-26(b)(3)(B) of this title.

(ii) Incorporation into contract

In the case of such a waiver granted to an organization with respect to a State, the Secretary shall incorporate the requirement that the organization (and Medicare+Choice plans it offers) comply with standards under clause (i) as part of the contract between the Secretary and the organization under section 1395w-27 of this title.

(iii) Enforcement

In the case of such a waiver granted to an organization with respect to a State, the Secretary may enter into an agreement with the State under which the State agrees to provide for monitoring and enforcement activities with respect to compliance of such an organization and its Medicare+Choice plans with such standards. Such monitoring and enforcement shall be conducted by the State in the same manner as the State enforces such standards with respect to other Medicare+Choice organizations and plans, without discrimination based on the type of organization to which the standards apply. Such an agreement shall specify or establish mechanisms by which compliance activities are undertaken, while not lengthening the time required to review and process applications for waivers under this paragraph.

(H) Report

By not later than December 31, 2001, the Secretary shall submit to the Committee on Ways and Means and the Committee on Commerce of the House of Representatives and the Committee on Finance of the Senate a report regarding whether the waiver process under this paragraph should be continued after December 31, 2002. In making such recommendation, the Secretary shall consider, among other factors, the impact of such process on beneficiaries and on the long-term solvency of the program under this subchapter.

(3) Licensure does not substitute for or constitute certification

The fact that an organization is licensed in accordance with paragraph (1) does not deem the organization to meet other requirements imposed under this part.

(b) Assumption of full financial risk

The Medicare+Choice organization shall assume full financial risk on a prospective basis for the provision of the health care services for which benefits are required to be provided under section 1395w-22(a)(1) of this title, except that the organization -

(1) may obtain insurance or make other arrangements for the cost of providing to any enrolled member such

services the aggregate value of which exceeds such aggregate level as the Secretary specifies from time to time,

(2) may obtain insurance or make other arrangements for the cost of such services provided to its enrolled members other than through the organization because medical necessity required their provision before they could be secured through the organization,

(3) may obtain insurance or make other arrangements for not more than 90 percent of the amount by which its costs for any of its fiscal years exceed 115 percent of its income for such fiscal year, and

(4) may make arrangements with physicians or other health care professionals, health care institutions, or any combination of such individuals or institutions to assume all or part of the financial risk on a prospective basis for the provision of basic health services by the physicians or other health professionals or through the institutions.

(c) Certification of provision against risk of insolvency for unlicensed PSOs

(1) In general

Each Medicare+Choice organization that is a provider-sponsored organization, that is not licensed by a State under subsection (a) of this section, and for which a waiver application has been approved under subsection (a)(2) of this section, shall meet standards established under section 1395w-26(a) of this title relating to the financial solvency and capital adequacy of the organization.

(2) Certification process for solvency standards for PSOs

The Secretary shall establish a process for the receipt and approval of applications of a provider-sponsored organization described in paragraph (1) for certification (and periodic recertification) of the organization as meeting such solvency standards. Under such process, the Secretary shall act upon such a certification application not later than 60 days after the date the application has been received.

(d) "Provider-sponsored organization" defined

(1) In general

In this part, the term "provider-sponsored organization" means a public or private entity -

(A) that is established or organized, and operated, by a health care provider, or group of affiliated health care providers,

(B) that provides a substantial proportion (as defined by the Secretary in accordance with paragraph (2)) of the health care items and services under the contract under this part directly through the provider or affiliated group of providers, and

(C) with respect to which the affiliated providers share, directly or indirectly, substantial financial risk with respect to the provision of such items and services and have at least a majority financial interest in the entity.

(2) Substantial proportion

In defining what is a "substantial proportion" for purposes of paragraph (1)(B), the Secretary -

(A) shall take into account the need for such an organization to assume responsibility for providing -

(i) significantly more than the majority of the items and services under the contract under this section through its own affiliated providers; and

(ii) most of the remainder of the items and services under the contract through providers with which the organization has an agreement to provide such items and services,

in order to assure financial stability and to address the practical considerations involved in integrating the delivery of a wide range of service providers;

(B) shall take into account the need for such an organization to provide a limited proportion of the items and services under the contract through providers that are neither affiliated with nor have an agreement with the organization; and

(C) may allow for variation in the definition of substantial proportion among such organizations based on relevant differences among the organizations, such as their location in an urban or rural area.

(3) Affiliation

For purposes of this subsection, a provider is "affiliated" with another provider if, through contract, ownership, or otherwise -

(A) one provider, directly or indirectly, controls, is controlled by, or is under common control with the other,

(B) both providers are part of a controlled group of corporations under section 1563 of the Internal Revenue Code of 1986,

(C) each provider is a participant in a lawful combination under which each provider shares substantial financial risk in connection with the organization's operations, or

(D) both providers are part of an affiliated service group under section 414 of such Code.

(4) Control

For purposes of paragraph (3), control is presumed to exist if one party, directly or indirectly, owns, controls, or holds the power to vote, or proxies for, not less than 51 percent of the voting rights or governance rights of another.

(5) "Health care provider" defined

In this subsection, the term "health care provider" means -

(A) any individual who is engaged in the delivery of health care services in a State and who is required by State law or regulation to be licensed or certified by the State to engage in the delivery of such services in the State, and

(B) any entity that is engaged in the delivery of health care services in a State and that, if it is required by State law or regulation to be licensed or certified by the State to engage in the delivery of such services in the State, is so licensed.

(6) Regulations

The Secretary shall issue regulations to carry out this subsection.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1855, as added Pub. L. 105-33, title IV, Sec. 4001, Aug. 5, 1997, 111 Stat. 312.)

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

## 42 USC § 1395w-26

## United States Code (USC)

**Title 42 - THE PUBLIC HEALTH AND WELFARE**
**Chapter 7 - SOCIAL SECURITY**
**42 USC § 1395w-26 Establishment of standards**

---

### 42 USC § 1395w-26. Establishment of standards

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Part C - Medicare+Choice Program

(a) Establishment of solvency standards for provider-sponsored organizations

(1) Establishment

(A) In general

The Secretary shall establish, on an expedited basis and using a negotiated rulemaking process under subchapter III of chapter 5 of title 5, standards described in section 1395w-25(c)(1) of this title (relating to the financial solvency and capital adequacy of the organization) that entities must meet to qualify as provider-sponsored organizations under this part.

(B) Factors to consider for solvency standards

In establishing solvency standards under subparagraph (A) for provider-sponsored organizations, the Secretary shall consult with interested parties and shall take into account -

(i) the delivery system assets of such an organization and ability of such an organization to provide services directly to enrollees through affiliated providers,

(ii) alternative means of protecting against insolvency, including reinsurance, unrestricted surplus, letters of credit, guarantees, organizational insurance coverage, partnerships with other licensed entities, and valuation attributable to the ability of such an organization to meet its service obligations through direct delivery of care, and

(iii) any standards developed by the National Association of Insurance Commissioners specifically for risk-based health care delivery organizations.

(C) Enrollee protection against insolvency

Such standards shall include provisions to prevent enrollees from being held liable to any person or entity for the Medicare+Choice organization's debts in the event of the organization's insolvency.

(2) Publication of notice

In carrying out the rulemaking process under this subsection, the Secretary, after consultation with the National Association of Insurance Commissioners, the American Academy of Actuaries, organizations representative of medicare beneficiaries, and other interested parties, shall publish the notice provided for under section 564(a) of title 5 by not later than 45 days after August 5, 1997.

(3) Target date for publication of rule

As part of the notice under paragraph (2), and for purposes of this subsection, the "target date for publication" (referred to in section 564(a)(5) of such title) shall be April 1, 1998.

(4) Abbreviated period for submission of comments

In applying section 564(c) of such title under this subsection, "15 days" shall be substituted for "30 days".

(5) Appointment of negotiated rulemaking committee and facilitator

The Secretary shall provide for -

(A) the appointment of a negotiated rulemaking committee under section 565(a) of such title by not later than 30 days after the end of the comment period provided for under section 564(c) of such title (as shortened under paragraph (4)), and

(B) the nomination of a facilitator under section 566(c) of such title by not later than 10 days after the date of appointment of the committee.

(6) Preliminary committee report

The negotiated rulemaking committee appointed under paragraph (5) shall report to the Secretary, by not later than January 1, 1998, regarding the committee's progress on achieving a consensus with regard to the rulemaking proceeding and whether such consensus is likely to occur before 1 month before the target date for publication of the rule. If the committee reports that the committee has failed to make significant progress towards such consensus or is unlikely to reach such consensus by the target date, the Secretary may terminate such process and provide for the publication of a rule under this subsection through such other methods as the Secretary may provide.

(7) Final committee report

If the committee is not terminated under paragraph (6), the rulemaking committee shall submit a report containing a proposed rule by not later than 1 month before the target date of publication.

(8) Interim, final effect

The Secretary shall publish a rule under this subsection in the Federal Register by not later than the target date of publication. Such rule shall be effective and final immediately on an interim basis, but is subject to change and revision after public notice and opportunity for a period (of not less than 60 days) for public comment. In connection with such rule, the Secretary shall specify the process for the timely review and approval of applications of entities to be certified as provider-sponsored organizations pursuant to such rules and consistent with this subsection.

(9) Publication of rule after public comment

The Secretary shall provide for consideration of such comments and republication of such rule by not later than 1 year after the target date of publication.

(b) Establishment of other standards

(1) In general

The Secretary shall establish by regulation other standards (not described in subsection (a) of this section) for Medicare+Choice organizations and plans consistent with, and to carry out, this part. The Secretary shall publish such regulations by June 1, 1998. In order to carry out this requirement in a timely manner, the Secretary may promulgate regulations that take effect on an interim basis, after notice and pending opportunity for public comment.

(2) Use of current standards

Consistent with the requirements of this part, standards established under this subsection shall be based on standards established under section 1395mm of this title to carry out analogous provisions of such section.

(3) Relation to State laws

The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

(4) Prohibition of midyear implementation of significant new regulatory requirements

The Secretary may not implement, other than at the beginning of a calendar year, regulations under this section that impose new, significant regulatory requirements on a Medicare+Choice organization or plan.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1856, as added Pub. L. 105-33, title IV, Sec. 4001, Aug. 5, 1997, 111 Stat. 317; amended Pub. L. 106-554, Sec. 1(a)(6) [title VI, Secs. 612(a), 614(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A-560; Pub. L. 108-173, title II, Sec. 232(a), Dec. 8, 2003, 117 Stat. 2208.)

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

# EXHIBIT B



Dear PEEHIP Retiree,

Have your premiums increased with your current plan? Are you having second thoughts about your healthcare coverage? Then VIVA MEDICARE *Plus* may be the plan for you.

If you are a Public Education Retiree on Medicare and eligible for PEEHIP benefits, we have a special program for you. If you want more benefits than traditional Medicare offers, **VIVA PEEHIP** with VIVA MEDICARE *Plus* is an excellent choice. Best of all, VIVA MEDICARE *Plus* has no monthly plan premium (you continue to pay your Part B premium to Medicare). VIVA MEDICARE *Plus* is offered under a contract with the federal government. We offer the following benefits:

- **No Yearly Medical Deductibles**
- **$0 Physician or Specialty Copays**
- **$0 Hospital admission or One Day Surgery Copays**
- **$0 Ambulance or Emergency Room visit Copays**
- **A Comprehensive Dental Plan through CompBenefits**
- **Prescription Drug Benefit ($12 generics, $25 preferred brands, $45 non-preferred brands up to $3000 /year)\***

Plus, added benefits such as:
**$20 Towards YMCA Monthly Membership**
**$200 Allowance for Eye Glasses or Contact Lenses**
**20 free rides (10 round trips) a year for medical care**

**<u>The open enrollment for this program ends August 30, 2006!</u>** Call VIVA MEDICARE *Plus* now to receive more information about the PEEHIP option and how to enroll: (**205**) **933-8482** in Birmingham or (**888**) **830-8482**. For TTY services, call the Alabama Relay Service at (800) 548-2546. We welcome any questions you may have and we look forward to serving you.

\*This applies to **VIVA PEEHIP** with VIVA MEDICARE *Plus*. VIVA MEDICARE *Plus* also offers a plan with Medicare Part D prescription drugs. Call now for more details.



VIVA MEDICARE PLUS
1400 21st Place South
Birmingham, Alabama 35205

Call;
check on this!!!

*********AUTO**3-DIGIT 360
Susie J Williams
14333 County Road 45
Union Springs, AL 36089-3001

9296 T30 P1

Presort Standard
U.S. Postage
PAID
Permit #2061
Birmingham, AL

# EXHIBIT C

**42 USC § 1395w-104**

**United States Code (USC)**

**Title 42 - THE PUBLIC HEALTH AND WELFARE**

**Chapter 7 - SOCIAL SECURITY**

**42 USC § 1395w-104 Beneficiary protections for qualified prescription drug coverage**

---

### 42 USC § 1395w-104. Beneficiary protections for qualified prescription drug coverage

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Part D - Voluntary Prescription Drug Benefit Program

subpart 1 - part d eligible individuals and prescription drug benefits

(a) Dissemination of information

(1) General information

(A) Application of MA information

A PDP sponsor shall disclose, in a clear, accurate, and standardized form to each enrollee with a prescription drug plan offered by the sponsor under this part at the time of enrollment and at least annually thereafter, the information described in section 1395w-22(c)(1) of this title relating to such plan, insofar as the Secretary determines appropriate with respect to benefits provided under this part, and including the information described in subparagraph (B).

(B) Drug specific information

The information described in this subparagraph is information concerning the following:

(i) Access to specific covered part D drugs, including access through pharmacy networks.

(ii) How any formulary (including any tiered formulary structure) used by the sponsor functions, including a description of how a part D eligible individual may obtain information on the formulary consistent with paragraph (3).

(iii) Beneficiary cost-sharing requirements and how a part D eligible individual may obtain information on such requirements, including tiered or other copayment level applicable to each drug (or class of drugs), consistent with paragraph (3).

(iv) The medication therapy management program required under subsection (c) of this section.

(2) Disclosure upon request of general coverage, utilization, and grievance information

Upon request of a part D eligible individual who is eligible to enroll in a prescription drug plan, the PDP sponsor offering such plan shall provide information similar (as determined by the Secretary) to the information described in subparagraphs (A), (B), and (C) of section 1395w-22(c)(2) of this title to such individual.

(3) Provision of specific information

(A) Response to beneficiary questions

Each PDP sponsor offering a prescription drug plan shall have a mechanism for providing specific information on a timely basis to enrollees upon request. Such mechanism shall include access to information through the use of a toll-free telephone number and, upon request, the provision of such information in writing.

(B) Availability of information on changes in formulary through the Internet

A PDP sponsor offering a prescription drug plan shall make available on a timely basis through an Internet website information on specific changes in the formulary under the plan (including changes to tiered or preferred status of covered part D drugs).

(4) Claims information

A PDP sponsor offering a prescription drug plan must furnish to each enrollee in a form easily understandable to such enrollees -

(A) an explanation of benefits (in accordance with section 1395b-7(a) of this title or in a comparable manner); and

(B) when prescription drug benefits are provided under this part, a notice of the benefits in relation to -

(i) the initial coverage limit for the current year; and

(ii) the annual out-of-pocket threshold for the current year.

Notices under subparagraph (B) need not be provided more often than as specified by the Secretary and notices under subparagraph (B)(ii) shall take into account the application of section 1395w-102(b)(4)(C) of this title to the extent practicable, as specified by the Secretary.

(b) Access to covered part D drugs

(1) Assuring pharmacy access

(A) Participation of any willing pharmacy

A prescription drug plan shall permit the participation of any pharmacy that meets the terms and conditions under the plan.

(B) Discounts allowed for network pharmacies

For covered part D drugs dispensed through in-network pharmacies, a prescription drug plan may, notwithstanding subparagraph (A), reduce coinsurance or copayments for part D eligible individuals enrolled in the plan below the level otherwise required. In no case shall such a reduction result in an increase in payments made by the Secretary under section 1395w-115 of this title to a plan.

(C) Convenient access for network pharmacies

(i) In general

The PDP sponsor of the prescription drug plan shall secure the participation in its network of a sufficient number of pharmacies that dispense (other than by mail order) drugs directly to patients to ensure convenient access (consistent with rules established by the Secretary).

(ii) Application of TRICARE standards

The Secretary shall establish rules for convenient access to in-network pharmacies under this subparagraph that are no less favorable to enrollees than the rules for convenient access to pharmacies included in the statement of work of solicitation (#MDA906-03-R-0002) of the Department of Defense under the TRICARE Retail Pharmacy (TRRx) as of March 13, 2003.

(iii) Adequate emergency access

Such rules shall include adequate emergency access for enrollees.

(iv) Convenient access in long-term care facilities

Such rules may include standards with respect to access for enrollees who are residing in long-term care facilities and for pharmacies operated by the Indian Health Service, Indian tribes and tribal organizations, and urban Indian organizations (as defined in section 1603 of title 25).

(D) Level playing field

Such a sponsor shall permit enrollees to receive benefits (which may include a 90-day supply of drugs or biologicals) through a pharmacy (other than a mail order pharmacy), with any differential in charge paid by such enrollees.

(E) Not required to accept insurance risk

The terms and conditions under subparagraph (A) may not require participating pharmacies to accept insurance risk as a condition of participation.

(2) Use of standardized technology

(A) In general

The PDP sponsor of a prescription drug plan shall issue (and reissue, as appropriate) such a card (or other technology) that may be used by an enrollee to assure access to negotiated prices under section 1395w-102(d) of this title.

(B) Standards

(i) In general

The Secretary shall provide for the development, adoption, or recognition of standards relating to a standardized format for the card or other technology required under subparagraph (A). Such standards shall be compatible with part C of subchapter XI of this chapter and may be based on standards developed by an appropriate standard setting organization.

(ii) Consultation

In developing the standards under clause (i), the SecretaRy shall consult with the National Council for Prescription Drug Programs and other standard setting organizations determined appropriate by the Secretary.

(iii) Implementation

The Secretary shall develop, adopt, or recognize the standards under clause (i) by such date as the Secretary determines shall be sufficient to ensure that PDP sponsors utilize such standards beginning January 1, 2006.

(3) Requirements on development and application of formularies

If a PDP sponsor of a prescription drug plan uses a formulary (including the use of tiered cost-sharing), the following requirements must be met:

(A) Development and revision by a pharmacy and therapeutic (P&T) committee

(i) In general

The formulary must be developed and reviewed by a pharmacy and therapeutic committee. A majority of the members of such committee shall consist of individuals who are practicing physicians or practicing pharmacists (or both).

(ii) Inclusion of independent experts

Such committee shall include at least one practicing physician and at least one practicing pharmacist, each of whom

(I) is independent and free of conflict with respect to the sponsor and plan; and

(II) has expertise in the care of elderly or disabled persons.

(B) Formulary development

In developing and reviewing the formulary, the committee shall -

(i) base clinical decisions on the strength of scientific evidence and standards of practice, including assessing peer-reviewed medical literature, such as randomized clinical trials, pharmacoeconomic studies, outcomes research data, and on such other information as the committee determines to be appropriate; and

(ii) take into account whether including in the formulary (or in a tier in such formulary) particular covered part D drugs has therapeutic advantages in terms of safety and efficacy.

(C) Inclusion of drugs in all therapeutic categories and classes

(i) In general

The formulary must include drugs within each therapeutic category and class of covered part D drugs, although not necessarily all drugs within such categories and classes.

(ii) Model guidelines

The Secretary shall request the United States Pharmacopeia to develop, in consultation with pharmaceutical benefit managers and other interested parties, a list of categories and classes that may be used by prescription drug plans under this paragraph and to revise such classification from time to time to reflect changes in therapeutic uses of covered part

D drugs and the additions of new covered part D drugs.

    (iii) Limitation on changes in therapeutic classification

The PDP sponsor of a prescription drug plan may not change the therapeutic categories and classes in a formulary other than at the beginning of each plan year except as the Secretary may permit to take into account new therapeutic uses and newly approved covered part D drugs.

    (D) Provider and patient education

The PDP sponsor shall establish policies and procedures to educate and inform health care providers and enrollees concerning the formulary.

    (E) Notice before removing drug from formulary or changing preferred or tier status of drug

Any removal of a covered part D drug from a formulary and any change in the preferred or tiered cost-sharing status of such a drug shall take effect only after appropriate notice is made available (such as under subsection (a)(3) of this section) to the Secretary, affected enrollees, physicians, pharmacies, and pharmacists.

    (F) Periodic evaluation of protocols

In connection with the formulary, the sponsor of a prescription drug plan shall provide for the periodic evaluation and analysis of treatment protocols and procedures.

The requirements of this paragraph may be met by a PDP sponsor directly or through arrangements with another entity.

    (c) Cost and utilization management; quality assurance; medication therapy management program

    (1) In general

The PDP sponsor shall have in place, directly or through appropriate arrangements, with respect to covered part D drugs, the following:

    (A) A cost-effective drug utilization management program, including incentives to reduce costs when medically appropriate, such as through the use of multiple source drugs (as defined in section 1396r-8(k)(7)(A)(i) of this title).

    (B) Quality assurance measures and systems to reduce medication errors and adverse drug interactions and improve medication use.

    (C) A medication therapy management program described in paragraph (2).

    (D) A program to control fraud, abuse, and waste.

Nothing in this section shall be construed as impairing a PDP sponsor from utilizing cost management tools (including differential payments) under all methods of operation.

    (2) Medication therapy management program

    (A) Description

(i) In general

A medication therapy management program described in this paragraph is a program of drug therapy management that may be furnished by a pharmacist and that is designed to assure, with respect to targeted beneficiaries described in clause (ii), that covered part D drugs under the prescription drug plan are appropriately used to optimize therapeutic outcomes through improved medication use, and to reduce the risk of adverse events, including adverse drug interactions. Such a program may distinguish between services in ambulatory and institutional settings.

(ii) Targeted beneficiaries described

Targeted beneficiaries described in this clause are part D eligible individuals who -

(I) have multiple chronic diseases (such as diabetes, asthma, hypertension, hyperlipidemia, and congestive heart failure);

(II) are taking multiple covered part D drugs; and

(III) are identified as likely to incur annual costs for covered part D drugs that exceed a level specified by the Secretary.

(B) Elements

Such program may include elements that promote -

(i) enhanced enrollee understanding to promote the appropriate use of medications by enrollees and to reduce the risk of potential adverse events associated with medications, through beneficiary education, counseling, and other appropriate means;

(ii) increased enrollee adherence with prescription medication regimens through medication refill reminders, special packaging, and other compliance programs and other appropriate means; and

(iii) detection of adverse drug events and patterns of overuse and underuse of prescription drugs.

(C) Development of program in cooperation with licensed pharmacists

Such program shall be developed in cooperation with licensed and practicing pharmacists and physicians.

(D) Coordination with care management plans

The Secretary shall establish guidelines for the coordination of any medication therapy management program under this paragraph with respect to a targeted beneficiary with any care management plan established with respect to such beneficiary under a chronic care improvement program under section 1395b-8 of this title.

(E) Considerations in pharmacy fees

The PDP sponsor of a prescription drug plan shall take into account, in establishing fees for pharmacists and others providing services under such plan, the resources used, and time required to, implement the medication therapy management program under this paragraph. Each such sponsor shall disclose to the Secretary upon request the amount of any such management or dispensing fees. The provisions of section 1396r-8(b)(3)(D) of this title apply to information disclosed under this subparagraph.

(d) Consumer satisfaction surveys

In order to provide for comparative information under section 1395w-101(c)(3)(A)(v) of this title, the Secretary shall conduct consumer satisfaction surveys with respect to PDP sponsors and prescription drug plans in a manner similar to the manner such surveys are conducted for MA organizations and MA plans under part C of this subchapter.

(e) Electronic prescription program

(1) Application of standards

As of such date as the Secretary may specify, but not later than 1 year after the date of promulgation of final standards under paragraph (4)(D), prescriptions and other information described in paragraph (2)(A) for covered part D drugs prescribed for part D eligible individuals that are transmitted electronically shall be transmitted only in accordance with such standards under an electronic prescription drug program that meets the requirements of paragraph (2).

(2) Program requirements

Consistent with uniform standards established under paragraph (3) -

(A) Provision of information to prescribing health care professional and dispensing pharmacies and pharmacists An electronic prescription drug program shall provide for the electronic transmittal to the prescribing health care professional and to the dispensing pharmacy and pharmacist of the prescription and information on eligibility and benefits (including the drugs included in the applicable formulary, any tiered formulary structure, and any requirements for prior authorization) and of the following information with respect to the prescribing and dispensing of a covered part D drug:

(i) Information on the drug being prescribed or dispensed and other drugs listed on the medication history, including information on drug-drug interactions, warnings or cautions, and, when indicated, dosage adjustments.

(ii) Information on the availability of lower cost, therapeutically appropriate alternatives (if any) for the drug prescribed.

(B) Application to medical history information

Effective on and after such date as the Secretary specifies and after the establishment of appropriate standards to carry out this subparagraph, the program shall provide for the electronic transmittal in a manner similar to the manner under subparagraph (A) of information that relates to the medical history concerning the individual and related to a covered part D drug being prescribed or dispensed, upon request of the professional or pharmacist involved.

(C) Limitations

Information shall only be disclosed under subparagraph (A) or (B) if the disclosure of such information is permitted under the Federal regulations (concerning the privacy of individually identifiable health information) promulgated under section 264(c) of the Health Insurance Portability and Accountability Act of 1996.

(D) Timing

To the extent feasible, the information exchanged under this paragraph shall be on an interactive, real-time basis.

(3) Standards

(A) In general

The Secretary shall provide consistent with this subsection for the promulgation of uniform standards relating to the requirements for electronic prescription drug programs under paragraph (2).

(B) Objectives

Such standards shall be consistent with the objectives of improving -

(i) patient safety;

(ii) the quality of care provided to patients; and

(iii) efficiencies, including cost savings, in the delivery of care.

(C) Design criteria

Such standards shall -

(i) be designed so that, to the extent practicable, the standards do not impose an undue administrative burden on prescribing health care professionals and dispensing pharmacies and pharmacists;

(ii) be compatible with standards established under part C of subchapter XI of this chapter, standards established under subsection (b)(2)(B)(i) of this section, and with general health information technology standards; and

(iii) be designed so that they permit electronic exchange of drug labeling and drug listing information maintained by the Food and Drug Administration and the National Library of Medicine.

(D) Permitting use of appropriate messaging

Such standards shall allow for the messaging of information only if it relates to the appropriate prescribing of drugs, including quality assurance measures and systems referred to in subsection (c)(1)(B) of this section.

(E) Permitting patient designation of dispensing pharmacy

(i) In general

Consistent with clause (ii), such standards shall permit a part D eligible individual to designate a particular pharmacy to dispense a prescribed drug.

(ii) No change in benefits

Clause (i) shall not be construed as affecting -

(I) the access required to be provided to pharmacies by a prescription drug plan; or

(II) the application of any differences in benefits or payments under such a plan based on the pharmacy dispensing

a covered part D drug.

(4) Development, promulgation, and modification of standards

(A) Initial standards

Not later than September 1, 2005, the Secretary shall develop, adopt, recognize, or modify initial uniform standards relating to the requirements for electronic prescription drug programs described in paragraph (2) taking into consideration the recommendations (if any) from the National Committee on Vital and Health Statistics (as established under section 242k(k) of this title) under subparagraph (B).

(B) Role of NCVHS

The National Committee on Vital and Health Statistics shall develop recommendations for uniform standards relating to such requirements in consultation with the following:

(i) Standard setting organizations (as defined in section 1320d(8) of this title)

(ii) Practicing physicians.

(iii) Hospitals.

(iv) Pharmacies.

(v) Practicing pharmacists.

(vi) Pharmacy benefit managers.

(vii) State boards of pharmacy.

(viii) State boards of medicine.

(ix) Experts on electronic prescribing.

(x) Other appropriate Federal agencies.

(C) Pilot project to test initial standards

(i) In general

During the 1-year period that begins on January 1, 2006, the Secretary shall conduct a pilot project to test the initial standards developed under subparagraph (A) prior to the promulgation of the final uniform standards under subparagraph (D) in order to provide for the efficient implementation of the requirements described in paragraph (2).

(ii) Exception

Pilot testing of standards is not required under clause (i) where there already is adequate industry experience with such standards, as determined by the Secretary after consultation with effected standard setting organizations and industry users.

(iii) Voluntary participation of physicians and pharmacies

In order to conduct the pilot project under clause (i), the Secretary shall enter into agreements with physicians, physician groups, pharmacies, hospitals, PDP sponsors, MA organizations, and other appropriate entities under which health care professionals electronically transmit prescriptions to dispensing pharmacies and pharmacists in accordance with such standards.

(iv) Evaluation and report

(I) Evaluation

The Secretary shall conduct an evaluation of the pilot project conducted under clause (i).

(II) Report to Congress

Not later than April 1, 2007, the Secretary shall submit to Congress a report on the evaluation conducted under subclause (I).

(D) Final standards

Based upon the evaluation of the pilot project under subparagraph (C)(iv)(I) and not later than April 1, 2008, the Secretary shall promulgate uniform standards relating to the requirements described in paragraph (2).

(5) Relation to State laws

The standards promulgated under this subsection shall supersede any State law or regulation that -

(A) is contrary to the standards or restricts the ability to carry out this part; and

(B) pertains to the electronic transmission of medication history and of information on eligibility, benefits, and prescriptions with respect to covered part D drugs under this part.

(6) Establishment of safe harbor

The Secretary, in consultation with the Attorney General, shall promulgate regulations that provide for a safe harbor from sanctions under paragraphs (1) and (2) of section 1320a-7b(b) of this title and an exception to the prohibition under subsection (a)(1) of section 1395nn of this title with respect to the provision of nonmonetary remuneration (in the form of hardware, software, or information technology and training services) necessary and used solely to receive and transmit electronic prescription information in accordance with the standards promulgated under this subsection -

(A) in the case of a hospital, by the hospital to members of its medical staff;

(B) in the case of a group practice (as defined in section 1395nn(h)(4) of this title), by the practice to prescribing health care professionals who are members of such practice; and

(C) in the case of a PDP sponsor or MA organization, by the sponsor or organization to pharmacists and pharmacies participating in the network of such sponsor or organization, and to prescribing health care professionals.

(f) Grievance mechanism

Each PDP sponsor shall provide meaningful procedures for hearing and resolving grievances between the sponsor (including any entity or individual through which the sponsor provides covered benefits) and enrollees with prescription drug plans of the sponsor under this part in accordance with section 1395w-22(f) of this title.

(g) Coverage determinations and reconsiderations

(1) Application of coverage determination and reconsideration provisions

A PDP sponsor shall meet the requirements of paragraphs (1) through (3) of section 1395w-22(g) of this title with respect to covered benefits under the prescription drug plan it offers under this part in the same manner as such requirements apply to an MA organization with respect to benefits it offers under an MA plan under part C of this subchapter.

(2) Request for a determination for the treatment of tiered formulary drug

In the case of a prescription drug plan offered by a PDP sponsor that provides for tiered cost-sharing for drugs included within a formulary and provides lower cost-sharing for preferred drugs included within the formulary, a part D eligible individual who is enrolled in the plan may request an exception to the tiered cost-sharing structure. Under such an exception, a nonpreferred drug could be covered under the terms applicable for preferred drugs if the prescribing physician determines that the preferred drug for treatment of the same condition either would not be as effective for the individual or would have adverse effects for the individual or both. A PDP sponsor shall have an exceptions process under this paragraph consistent with guidelines established by the Secretary for making a determination with respect to such a request. Denial of such an exception shall be treated as a coverage denial for purposes of applying subsection (h) of this section.

(h) Appeals

(1) In general

Subject to paragraph (2), a PDP sponsor shall meet the requirements of paragraphs (4) and (5) of section 1395w-22 (g) of this title with respect to benefits (including a determination related to the application of tiered cost-sharing described in subsection (g)(2) of this section) in a manner similar (as determined by the Secretary) to the manner such requirements apply to an MA organization with respect to benefits under the original medicare fee-for-service program option it offers under an MA plan under part C of this subchapter. In applying this paragraph only the part D eligible individual shall be entitled to bring such an appeal.

(2) Limitation in cases on nonformulary determinations

A part D eligible individual who is enrolled in a prescription drug plan offered by a PDP sponsor may appeal under paragraph (1) a determination not to provide for coverage of a covered part D drug that is not on the formulary under the plan only if the prescribing physician determines that all covered part D drugs on any tier of the formulary for treatment of the same condition would not be as effective for the individual as the nonformulary drug, would have adverse effects for the individual, or both.

(3) Treatment of nonformulary determinations

If a PDP sponsor determines that a plan provides coverage for a covered part D drug that is not on the formulary of the plan, the drug shall be treated as being included on the formulary for purposes of section 1395w-102(b)(4)(C)(i) of this title.

(i) Privacy, confidentiality, and accuracy of enrollee records

The provisions of section 1395w-22(h) of this title shall apply to a PDP sponsor and prescription drug plan in the same manner as it applies to an MA organization and an MA plan.

(j) Treatment of accreditation

Subparagraph (A) of section 1395w-22(e)(4) of this title (relating to treatment of accreditation) shall apply to a PDP sponsor under this part with respect to the following requirements, in the same manner as it applies to an MA organization with respect to the requirements in subparagraph (B) (other than clause (vii) thereof) of such section:

(1) Subsection (b) of this section (relating to access to covered part D drugs).

(2) Subsection (c) of this section (including quality assurance and medication therapy management).

(3) Subsection (i) of this section (relating to confidentiality and accuracy of enrollee records).

(k) Public disclosure of pharmaceutical prices for equivalent drugs

(1) In general

A PDP sponsor offering a prescription drug plan shall provide that each pharmacy that dispenses a covered part D drug shall inform an enrollee of any differential between the price of the drug to the enrollee and the price of the lowest priced generic covered part D drug under the plan that is therapeutically equivalent and bioequivalent and available at such pharmacy.

(2) Timing of notice

(A) In general

Subject to subparagraph (B), the information under paragraph (1) shall be provided at the time of purchase of the drug involved, or, in the case of dispensing by mail order, at the time of delivery of such drug.

(B) Waiver

The Secretary may waive subparagraph (A) in such circumstances as the Secretary may specify.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1860D-4, as added Pub. L. 108-173, title I, Sec. 101(a)(2), Dec. 8, 2003, 117 Stat. 2082.)

---

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

# EXHIBIT D

**42 USC § 1395**

**United States Code (USC)**

**Title 42 - THE PUBLIC HEALTH AND WELFARE**

**Chapter 7 - SOCIAL SECURITY**

**42 USC § 1395 Prohibition against any Federal interference**

---

42 USC § 1395. Prohibition against any Federal interference

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1801, as added Pub. L. 89-97, title I, Sec. 102(a), July 30, 1965, 79 Stat. 291.)

---

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

# EXHIBIT E

**42 USC § 1395b**

**United States Code (USC)**

**Title 42 - THE PUBLIC HEALTH AND WELFARE**

**Chapter 7 - SOCIAL SECURITY**

**42 USC § 1395b Option to individuals to obtain other health insurance protection**

**42 USC § 1395b. Option to individuals to obtain other health insurance protection**

SUBCHAPTER XVIII - HEALTH INSURANCE FOR AGED AND DISABLED

Nothing contained in this subchapter shall be construed to preclude any State from providing, or any individual from purchasing or otherwise securing, protection against the cost of any health services.

(Aug. 14, 1935, ch. 531, title XVIII, Sec. 1803, as added Pub. L. 89-97, title I, Sec. 102(a), July 30, 1965, 79 Stat. 291.)

Lawriter Corporation. All rights reserved.

The Casemaker Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.

# EXHIBIT F



VIVA MEDICARE *Plus*
MEMBER OF THE UAB HEALTH SYSTEM

April 13, 2007

Ms. Susie Williams
c/o L. Cooper Rutland, Jr.
Rutland Law Firm, L.L.C.
208 North Prairie Street
Post Office Box 551
Union Springs, Alabama 36089

Re: Your VIVA Health coverage

Dear Ms. Williams:

VIVA Health has recently learned that the benefits of your VIVA Medicare Plus Select ("VIVA Medicare") and your VIVA Health plan for PEEHIP retirees might not have been what you anticipated. There may have been some confusion concerning the plan's coverage maximum for prescription drugs and coverage for syringes. There also may be some confusion about your dis-enrolling. At VIVA Health, we take pride in our customer service and we want to do whatever might be reasonable to assist you.

First, effective October 1, 2006, you completed two separate enrollment applications for membership in two separate VIVA Health plans. The primary plan, VIVA Medicare, is a Medicare Advantage plan offered by VIVA Health under a contract with the Centers for Medicare & Medicaid Services ("CMS"). The secondary plan is the plan VIVA Health offers to PEEHIP retirees, which enhances the benefits of VIVA Medicare by eliminating member out-of-pocket costs on covered medical services, adding coverage for dental services and eyewear, and adding a prescription drug benefit.

According to our records, you disenrolled from VIVA Medicare effective November 30, 2006. VIVA Health assumes that you returned to original Medicare for your Medicare benefits. Dis-enrollment from the secondary plan, VIVA Health for PEEHIP retirees, is controlled through PEEHIP. PEEHIP's rules govern when you can dis-enroll. In addition, Blue Cross Blue Shield of Alabama would have to agree to allow you to enroll in its plan, or you would not have PEEHIP coverage. VIVA Health cannot enroll you into Blue Cross PEEHIP coverage. To date, we have not received instructions from PEEHIP to dis-enroll you, but will do so as soon as such instructions are received. Generally, changes to PEEHIP coverage are made at open enrollment, which begins in the late summer for an October 1, 2007 effective date.

As to the prescription drug maximum, the prescription drug benefit offered under the VIVA Health plan for PEEHIP retirees does have a $3,000 maximum per calendar year. This maximum is stated in VIVA Health's marketing materials (including the original letter you received from VIVA Health making you aware of this plan). This limit is also included in the

1222 14th Avenue South, Birmingham, Alabama 35205
Phone (205) 918-2067 • 1-800-633-1542
For TTY Services: Call Alabama Relay at (800) 548-2546
Our office hours are Monday through Friday from 8:00 am to 5:00 pm

rider to the Evidence of Coverage you received at enrollment and again in early November as part of our annual mailing describing the additional benefits of enrolling in the VIVA Health plan for PEEHIP retirees. Our call documentation does not reflect that you have called concerning this prescription drug maximum.

Our records do not indicate that you have been impacted by this prescription drug maximum. You did not reach the maximum in 2006. The maximum reset on January 1, 2007, providing an additional $3,000 in benefit. You have not yet exhausted this amount in 2007.

Based on your misunderstanding of the coverage maximum and the importance of your medications to managing your medical conditions, VIVA Health will waive for you the $3,000 maximum for prescription drugs for your medical conditions until October 1, 2007. On October 1, 2007, you may change your coverage with PEEHIP back to the Blue Cross plan for retirees, if that plan better suits your needs, or you may continue with VIVA Health PEEHIP coverage for retirees with the annual $3,000 prescription drug maximum (unless this benefit changes for the next plan year), like other VIVA Health PEEHIP retiree participants.

As with the prescription drug coverage, our records do not indicate that you have had any claims for syringes that have not been paid. Unfortunately, Medicare does not allow Medicare Advantage plans that do not include Medicare Part D, like VIVA Medicare, to cover syringes. However, syringes are 100% covered on your VIVA Health PEEHIP plan from participating diabetic suppliers. To assist you, VIVA Health will also cover syringes under the VIVA Health plan for PEEHIP retirees prescription benefit so that you may get them at a participating pharmacy at no cost to you until October 1, 2007. If you have paid out of pocket for syringes before you brought this issue to our attention, please send us the receipts or other documentation letting us know what you have spent and VIVA Health will reimburse you.

VIVA Health's plans have grievance and complaint procedures, which can be initiated by calling us. Our records do not indicate that you submitted any complaint verbally or in writing as to any of the above issues. VIVA Health is always glad to attempt to resolve any issue you might have over the telephone. If you are not satisfied, though, with any aspect of your VIVA Health coverage, please submit something in writing, which should help resolve any issues.

VIVA Health regrets if our plans did not meet your expectations. Again, we will waive the $3,000 prescription drug coverage maximum and allow you to secure syringes through a participating pharmacy at no cost until October 1, 2007, your next opportunity to change your PEEHIP plan. We trust you will find these accommodations reasonable. Please contact me at (205) 558-7575 if you have any questions related to this letter.

Sincerely yours,

Latrina Hicks
Manager of Medicare Member Services
VIVA Health Inc.

# EXHIBIT G

STATE OF ALABAMA

COUNTY OF BULLOCK

### **AFFIDAVIT**

Before me, the undersigned, a Notary Public in and for said County, State of Alabama, first appeared Thomas Main and being duly sworn did depose and say

My name is Thomas Main.

I am a pharmacist with Main Drug Store in Union Springs, Alabama. I am intimately familiar with Susie Williams prescription problems. She has been a customer of mine for several years. It was brought to my attention that Susie Williams had been removed from her PEEHIP retirement health and prescription drug plan and placed in a plan administered by VIVA Health Care, Inc. It was determined that the prescription program would not be sufficient to provide Mrs. Williams with her needed insulin as there was a $3,000.00 cap on their drug program. I contacted VIVA Medicare Plus on at least seven occasions and spoke to different employees of VIVA to try and correct the problem. I was unsuccessful and was advised by VIVA Medicare officials that Mrs. Williams prescription coverage would run out at $3,000.00. I was also told by Fred, an employee of VIVA Medicare Plus, that they had enrolled Mrs. Williams in the wrong program and should have placed her in their PEEHIP Plan with the VIVA Medicare Plus RX which would have taken care of her needs. I have attached transcripts of phone conversations I had with VIVA officials at various times during the last four months. These are true and correct transcripts of recordings of those conversations.

Further affiant saith not.

_____
Thomas Main, Pharmacist
Main Drug Store

Sworn to and subscribed before me this the _25th_ day of _April_ 2007.

_____
Notary Public
Commission Expires _7-15-2010_

Transcription-1

**VIVA REP** - Thanks for holding, I am showing her in not the Care Mart but our regular system is showing that she is no longer on the PHIP plan but she is using a regular VIVA Medicare plus card?

**Main** - That's what it appears sir, yes sir and it did work today, so.

**VIVA rep** - Hmm, okay, yea cause I am still showing her open on a Care Mart but I am not showing her enrolled on our plan. I don't know how she is still using that card.

**Main** - It is kind of strange, I agree with you and I don't mean and the lady at PHIP said she did all she could do to get her put back on with you. I don't know if there is something.

**VIVA rep** - I am not even showing her on our plan but it still have her open up in our Care Mart system.

**Main** - Correct - so you do show her active in that Care Mart system?

**VIVA rep** -Yea but she is not active in our regular system.

**Main** - Yes sir - Well I mean, I guess anyway my question was does on her Care Mart benefits do you know what - does she have a cap there or I mean will that work.

**VIVA rep** - But the thing is in order for her to be in Care Mart, she has to be on our drug plan but if it is not showing her effective with VIVA coverage, then she can't use that card.

**Main** - Right - then what do we need to do for her I mean, tell me where we need to go with her actually.

**VIVA rep** - Okay hold on one moment

**Main** - No problem.

**VIVA** - Okay

**Main** - And so you will see where she got left out where she got left in the last week or two you know when she was dis-enrolled with VIVA, she was left out in the cold without any drug coverage and so you know the lady at PHIP was trying to get her, I thought, back in the PHIP but at the end she was actually putting her back in the VIVA.

**VIVA** - Okay hold on.

**VIVA rep** - Sir?

**Main** - Yes sir.

**VIVA** - Thank you for holding.

**Main** - No problem - I appreciate your help.

**VIVA** - Okay, to be honest with you - by her not being on the VIVA plan.

**Main** - Yes sir.

**VIVA** - She was taken off of PHIP back in November.

**Main** - Yes sir.

**VIVA** - She does not have benefits.

**Main** - Okay.

**VIVA** - But VIVA - we need to close her out in Care Mart - uhm and she is still open in Care Mart so actually she does not have any benefits with VIVA.

**Main** - Okay - so I guess what does that mean - she is not supposed to be getting the drugs, basically, is that what it means?

**VIVA** - Yea, she doesn't supposed to be using that card.

**Main** - Right, they just have not closed her out yet?

**VIVA** - Right, they just haven't closed her out yet in Care Mart

**Main** - Alright, I got'cha -  is that something that you haven't updated yet?

**VIVA** - I am going to have to check with our — policy department and make sure that they closed it out because they still had her open in Care Mart.

**Main** - Alright well then sir when you are asking them about it tell them the pharmacists sold them last week and all that and I was doing the exact same thing and it would not work and it was like she did not work and it was like she was actually cut out like you are saying and then uh we have been working with that lady at the PHIP and she was telling she has got it cut on or something and then it did work so there may be something going on behind the scenes, there, I don't.

**VIVA** - Yea, there.

**Main** - Right that you or me both don't know about, just so you will know sir.

**VIVA** - Do you know who the person is at PHIP?

**Main** - Yes, I do actually and I can give you their name and extension and name and everything.

**VIVA** - Okay.

**Main** - You got a pen?

**VIVA** - Yes sir.

**Main** - This is at PHIP office - you dial 800-214-2158 extension, I believe you dial 1 454 and her name is Kathy Green and she has talked with Ms Susie and you know she has been working with this for the last day or two or whatever, you know, and apparently she is working with somebody, the last I was told she, you know, I talked with her about an hour ago and she was telling me that she did get it cut back on with VIVA or something like that and it did work so apparently she does.

**VIVA** - I need to find, I don't know if we received the application showing that she was put back on the plan.

**Main** - Right

**VIVA** - And now I am showing her just enrolled as of November 30 but we still have her open in Care Mart.

**Main** - Right I gotta'cha.

**VIVA** - So I just need to find - your name.

**Main** - My name is Thomas Main M-a-i-n and I am at Main Drug store - Let me give you my phone number

**VIVA** - Okay.

**Main** - 334-738-2020 - I have been trying to help Ms Susie with this since awhile back, I tell you she, its on - not to bash anybody, we have a lot of reps that for some reason go door to door down here and they just - I am going to be straight up with you - they tell these patients that it is absolutely free - nothing will change, sign here and that is exactly what the man told her - Her drugs run about $8,000 a year and this drug plan that he signed her up on has a cap of apparently about $3,000.

**VIVA** -  ----- right, they have a $3,000 cap on the — plan - she shouldn't even - well you know what -

**Main** - Sir, she is a diabetic, her medicine is outrageous and she is poor, we are down here in

Bullock County, she can't afford this medicine, she is going to make it a couple of months and boom she is going to have to pay $5,000 or she is not going to have it so I am trying to head it off and it is a disaster.

**VIVA** - Okay.

**Main** - And I tell you where we are trying - I hit right when she signed up you know I researched it all because I had it happen to a bunch of patients and you know we were informed actually misinformed that if we got her out before the new year because it was the Part D enrollment period, in November or December, that she would be okay and so we did a dis-enrollment with VIVA so that she could go back to the PHIP and that is when I ran into the road block and just yesterday and today you know that the PHIP wouldn't take her back, they were saying it had to be done, you know, in a different time period but.

**VIVA** - Yes.

**Main** - Anyway, she the poor lady is in a pickle there

**VIVA** - You would think that they should have enrolled her in was — they could have enrolled her in VIVA Medicare Plus PHIP plan for on our RX drug plan because she is going to spend more than $3,000.

**Main** - Oh yea, absolutely.

**VIVA** - They just had her signed up on the wrong plan - she should have, they should have signed her up on our PHIP plan but under VIVA Medicare Plus RX drug plan -

**Main** - Gottacha - then after she would have had maybe a donut hole or something.

**VIVA** - Right right - and then it would have kicked in.

**Main** - Right absolutely but uh this is the worse case actually.

**VIVA** - Okay - let me call Kathy Green.

**Main** - Okay.

**VIVA** - And see what I can find out on her end and then uh - we can go from there and I can call you back once I kinda of figure out what is going on with.

**Main** - Okay actually, let me give you Ms Susie Williams', she is as sweet as she can be, she just got taken advantage of, let me give you her phone number, Ms Susie, what is your home phone number - 334 -485-3304 .

**VIVA** - Okay.

**Main** - And sir what is your name?

**VIVA** - My name is Fred.

**Main** - Okay Fred she has got a little book she is trying to keep going - I am going to write in - I have told her - cause we've got a bunch of Humana reps and everybody going door to door down here knocking on doors so I am going to tell her she can talk to Fred at VIVA cause you are not - you know you are trying to help her, okay.

**VIVA** - Okay.

**Main** - Cause uh, just so you know, cause we have them going door to door down here signing people up or whatever, but anyway, anyway Fred if you can help us out on that it would be great, okay.

**VIVA** - Okay thank you.

**Main** - Appreciate it Fred - Fred do you have a particular extension number at.

**VIVA** - Yes, it is 542.

**Main** - 542.

**VIVA** - Yes.

**Main** - Thank you Fred.

**VIVA** - Your welcome bye bye.

**Transcription - 2**

**Main** - You still there Ma'am.

**unidentified** - Yes.

**Main** - Okay anyway I have had this happen to so many people right then I knew she was in trouble so what I tried to figure out what her benefits were and we found out she had the $3,000 maximum so what we are trying to do is call PHIP and since there is like uh an enrollment period for the medicare part B plan in November and December, we were under the impression in talking to PHIP that if she would dis-enroll from VIVA she could you know she could re-enroll in the PHIP so we dis-enrolled her from VIVA in November and then uh you know we tried to get her back in PHIP and that is where we ran into a problem and as of a few days ago she wasn't in VIVA but the PHIP people have gotten her back into the VIVA, if that makes any

**unidentified** - And they just notified us yesterday.

**Main** - Right exactly so but the whole thing we were trying to get her back to PHIP cause, bless her heart, she is a diabetic, she doesn't have any money whatsoever, she barely makes it month to month on the co-pays with express scripts and by being in this plan automatically she is going to have to pay out of pocket about a $------ so we were trying our best to help her out and that is where we are, you know what I mean, cause if not, she is going to make it two or three months on these co-pays, you know and then she is going to be left out in the cold kinda if that makes any sense

**unidentified** - Yea, I understand and I don't - I unfortunately not the person who is going to help you with that because, I mean, we had her originally under PHIP I mean from the get go.

**Main** - Right.

**unidentified** - And that was one event that was going through everything with Express Script and had nothing to do with VIVA.

**Main** - Right that is exactly right because it didn't have a max it was her retirement insurance.

**unidentified** - Right and I mean that's so out of norm for me, I mean I don't have any idea about any of that.

**Main** - Right

**unidentified** - We just get our information from PHIP and we had her from October to the end of November under PHIP under her Medicare and effective as of yesterday they told us that effective back to 12-1 she was under one of her PHIP retiree benefits

**Main** - Right.

**Unidentified** - Umm, I don't know how I know what you are asking but I don't know how to go about getting that done.

**Main** - Right right

**Unidentified** - I don't even know who she would need to talk to about I mean, I don't know.

**Main** - Alright well I mean I guess my biggest question was that right now the way she signed up with y'all, she's gonna run out at $3,000 right.

**Unidentified** - Yes sir, I mean -------

**Main** - Well, that's really what I was trying to clarify for her because .

**Unidentified** - Okay

**Main** - Because the biggest thing was we are trying to prepare her for the upcoming whenever she hits that $3,000 because I don't know you know what I mean, she does not fully understand .

**Unidentified** - What's coming up?

**Main** - Right - how bad it's going to be because you know she is a diabetic on insulin and stuff like that she can't afford and once she doesn't take that she will end up in the hospital so I am trying my best to help her out you know.

**Unidentified** - She may want to contact somebody at PHIP.

**Main** - Well that's who we have been dealing with, in fact I talked to them several times over the past several months and they told us they couldn't let her back in PHIP since she was in the VIVA, that if we dis-enrolled her from the VIVA that you know they could pick her back up and now I'm finding out that they wouldn't do that they are saying that this particular type plan will only allow her to move in August or July if that makes sense, that's new to me but

**Unidentified** - Okay, I don't.

**Main** - But any way Ma'am I appreciate it - I appreciate your help.

**Unidentified** - I am sorry.

**Main** - What's your name Ma'am?

**Unidentified** - Stacey.

**Main** - Tracey -do you have an extension?

**Unidentified** - Stacey

**Main** - Stacey, I'm sorry do you have an extension number or anything that I can reach you at.

**Stacey** - I'm actually in Pharmacy thought, I don't - I can give you my number but I can give you another number also,

**Main** - Let me get yours first.

**Stacey** - 558

**Main** - 518

**Stacey** - 558 - I'm sorry you are breaking up.

**Main** - Okay go ahead.

**Stacey** - 7205.

**Main** - And that's area code 205.

**Stacey** - Yes Sir, area code 205 - 558-7551.

**Main** - do you have an extension.

**Stacey** - That's my direct line.

**Main** - okay.

**Stacey** - And also, let me give you this other number -1-800-294-7780 and that's my customer service and they may be able to help you more on the benefit side with her.

**Main** - Okay but you are with VIVA not Care Mart correct.

**Stacey** - Right I'm with VIVA yes Sir.

**Main** - Alright no problem I just wanted to make sure and like I said just - bless her heart you see where I am coming from she.

**Stacey** - Oh, I know.

**Main** - Okay thank you Ms Stacey.

**Stacey** - Its great that you are willing to do that for her and your willing to help.

**Main** - Well I am trying to, bless her heart, she is sweet as she can be and it's going to be a disaster for her and you know I'll tell you we have had so many reps down here from VIVA signing people up like this and they don't tell them anything and you know they just say it's no problem just sign here and then they end up you know.

**Stacey** - I'm not familiar with that because my understanding was I mean I didn't I thought they came straight from PHIP and I might ask somebody about it because I was not aware that our fellows was doing that .

**Main** - I have had another rep from VIVA to tell me that today so I actually clearly verified with the patient by sitting down with her that the person did come to her house and he did say nothing would change absolutely nothing would change when he signed her up so just for your knowledge or whatever - alright thank you Ma'am.

**Stacey** - What was your name?

**Main** - My name is Thomas Main I'm the pharmacist here at Main Drug Store and my number is 334 - you know you got my number.

**Stacey** - Okay - I am going to ask around and see if I can find out anything myself and I'll let you know if I do.

**Main** - Thank you Stacey cause like I said I mean right now she is okay because she is getting her medicine but you know two or three months - bless her heart she is going to be in trouble Thank you Ma'am.

**Stacey** - Okay thank you.

Transcription - 3

**Answering Machine** - Hi, this is Angie ----- at VIVA Health and Pharmacy, I'm here im just away from my desk or on another line. Please leave your name, number, and a brief message and I will return your call as soon as possible.

**Main** - Mrs. Isabel(Angie), this is Thomas Main, a Pharmacists calling from Main Drug Store in Union Springs. I have got one of your patients, Mrs. Susie J. Williams, umm, her member number is 0020973600, we are having a issue with her drug coverage. She was signed up by a VIVA representative. Anyway, if you could, please call me bak at 334-738-2020 and ask for Thomas Main. We needed some help with Mrs. Susie's situation if you could.

**Transcription - 4**

**Daphne** - Thank you for calling VIVA Medicare Plus, Daphne speaking, for quality purposes, can I have you member number please.

**Main** - Daphne, my name is Thomas Main and I am a Pharmacists calling from Main Drug Store, let me give you the ID number for the patient I am calling about.

**Daphne** - Ok

**Main** - Its going to be 419505603 for Mrs. Susie J. Williams 523.

**Daphne** - Ok, what can I help you with?

**Main** - Well Ma'am, Mrs Susie had been signed up on a VIVA Medicare Plan that had like a maximum on her drugs and she got a new member number and card and ummm I was just trying to make sure and see what her benefits were at this time.

**Daphne** - No Sir, for that, lets see now, it wouldn't be , lets see, ok VIVA Medicare Plus, perhaps maybe she has a different number because I am showing that she is no longer with us at this time.

**Main** - Ok, let me give you a new number that she got that is not on your card, it's a new member number, ok it's 0020973600.

**Daphne** - Ok, that is not ours.

**Main** - Alright

**Daphne** - -------let me see

**Main** - Well, I filled a prescription today and it went through on the, you know, it went through today so.

**Daphne** - Hold on for me just a minute for me, she just dis-enrolled with us on the 11/30

**Main**- Ok, thank you

**Daphne** - Your welcome

**Daphne** -  Sir?

**Main** - Yes Ma'am

**Daphne** - Ok, let me give you the correct telephone and the correct department to call and I

apologize for that.

**Main** - Ok Ma'am, hold on one second, let me get a pen, just a second ok, im sorry hang on just a second.......ok Ma'am, im sorry, go right ahead with that number

**Daphne** - 1-800-294-7780.

**Main** - Thank you.

**Daphne** - Ok sir, you have a good day.


## Transcription - 4a

**Latondra** - Viva health, this is Latondre, how can I help you?

**Main** - Yes Ma'am, my name is Thomas Main, a Pharmacists calling from Main Drug Store, and Ma'am I've got one of your patients I was trying to help with her VIVA medicare plan and I was trying to see if you could help us with something Ma'am.

**Latondra** - Ok, she is a medicare member.

**Main** - Yes Ma'am, she is right here, would you like to speak to her?

**Latondra** - Hold on, let me transfer you to VIVA Medicare Plus.

**Main** - Alright Ma'am this is a prescription issue, is that still where you need to send me?

**LaTondra** - Yes sir, hold for a moment.


## Transcription - 4b

**Answering Machine** - Thank you for calling VIVA Medicare Plus, all representatives are currently assisting other callers, your call is very important yo us, please hold and your call will be answered by the next available representative.  Your call may be recorded for quality purposes.

**Charlotte** - Thank you for calling VIVA Medicare Plus, this is Charlotte, for security purposes may I have your member ID number.

**Main** - Ms. Charlotte, my name is Thomas Main, I am a Pharmacists calling from Main Drug store and I am trying to help a patient with her Part D plan, or actually, VIVA Medicare Plan, if you could help us out with that.

**Charlotte** - Ok, spell your last name Thomas

**Main** - M-A-I-N

**Charlotte** - Ok, and the members Social Security Number.

**Main** - I have a Social Security Number or either her member number, which ever one.

**Charlotte** - It should be the same, the member has two zeros at the end.

**Main** - Ok, ummm, let me pull it right back up, hold on just a second.

**Charlotte** - What is her name?

**Main** - Susie J. Williams, and that VIVA medicare number I have is 4019505603 and I also have a new number but I was going to ask you, Mrs Susie is a teachers retiree and she was actually signed up for Medicare, we tried, when they signed her up, they signed her up for a drug plan that had a maximum cost that they would pay upwards to about $5,000.00, im not sure of the exact figure, and we were trying to get her converted to her past retirement on the express scripts or at least get her one of the Part D Plans that didn't have the maximum allowable on her medicine.

**Charlotte** - Just a moment please.

**Main** - Ok

**Charlotte** - I see that she dis-enrolled with us 11/30/06.

**Main** - Well I am filling prescriptions for her today and they are going through, umm.

**Charlotte** - Because she has PEHIP.

**Main** - But now, VIVA is paying me for it and I just didn't know and she is saying that she talked to a *Mr. Richard Brannon at VIVA, I talked to him earlier, and I have another member number that she was given, can I give you that number and see if it shows anything?

**Charlotte** - Ok, please.

**Main** - Its 0020973600.

**Charlotte** - Just a moment please.

**Main** - Alright, thank you Ma'am

**Charlotte** - Ok, I see that the new number has her under PEHIP retired and.

**Main** - Mostly I am just trying to help her with her drug coverage, she is a diabetic Ma'am and her drugs run about $8,000.00 - $10,000.00 per year and the was she was initially signed up with VIVA, they were telling me they actually had a maximum of $5,000.00, which would leave her owing upwards of $3,000.00 to $5,000.00 per year as long as nothing changed this year, and you know, she does not have that and the representative that came to her house and signed her up promised her nothing would change, but you know, its going to be pretty devastating for her, so we have really been trying to help her the best we could, and I have talked to numerous people and I just wanted to follow up with her and see if you can make a change.

**Charlotte** - Ok, let me check on something.

**Charlotte** - Sir, I just talked to umm, Blue Cross carries her prescription and coverage.

**Main** - So, are they , is this a new plan, for example, whenever they have Blue Cross Blue Shield of Alabama they have express scripts also that actually is ind of subcontracted out from the Blue Cross or whatever.

**Charlotte** - I don't know how Blue Cross works sir, I'm sorry.

**Main** - Ok let me just try right quick, of you have got just a second, to make sure, because they had that Blue Cross Policy terminated when she signed up with VIVA, let me actually try a claim on their just so we will both know actually, if you will hang on just a second, because they may have cut her back on, no they actually have disconnected that, they have canceled that from her so as far as your knowledge, she does not  have drug coverage, is that right?

**Charlotte** - Ok, see she is not in our Care Mart system.

**Main** - Right.

**Charlotte** - But are drugs going through?

**Main** - Yes Ma'am that is what I am saying, I filled her insulin today and it went through and I have got the plan set up as VIVA that paid e for it and I can give you ...

**Charlotte** - Hold on just a moment and I can look and see if its going under her Social Security Number.

**Main** - Yes it is actually, that is the ID number I am using is her Social Security Number.

**BREAK IN RECORDING**

**Charlotte**: She is going to wind up having to pay for that because that particular.

**Main** - Because you know usually, with every other insurance company I have had this problem with, they update it right quick in their computer and I am concerned because it goes through fine in my end.

**Charlotte** - It shows there is no coverage on this screen either from her Social Security Number,

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, is that correct?

**Main** - Yes Ma'am, and is their anyway to access the system im looking at.

**Charlotte** - Care Mart.

**Main** - Yes Ma'am, like to verify because I don't know if yall need to send an update to them.

**Charlotte** - You see im ummm, pulled it up by her social security number and there is not anything coming up.

**Main** - Really? See I am transmitting, see I don't know if you know about that VIN number I'm using is 610029 with a process control number of CRK.

**Charlotte** - Hang on just a second ok.

**Main** - No problem.

**Charlotte** - Sir, I'm sorry, what has happed is her drugs are going in under her old coverage with us which is under the Social Security Number, they need to be going under the new number with is kind of a commercial type of coverage, and what I am going to have to  is call and get they to change that in the system.

**Main** - Ok so she does have coverage, is that correct?

**Charlotte** - As far as I know she does, but I don't know, can I have you phone number and let me call them.

**Main** - Sure no problem, the number is 334-738-2020, and there is no way to look up in your system and just tell us what her benefits are.

**Charlotte** - No.

**Main** - But yall tell the other company what to cover, correct.

**Charlotte** - Right, let me call they real fast and I will give you a call right back.

**Main** - Alright, and what was your name again Ma'am.

**Charlotte** - Charlotte.

**Main** - Charlotte, do you have an extension number

**Charlotte** - No, but I will be calling you right back.

**Main** - Ok.

**Charlotte** - Bye Bye.

**Transcription - 5**

**Main** - Main Drug Store, may I help you?

**Tanja** - This is Sandra with VIVA Medicare Plus.

**Main** - Yes Ma'am Mrs Sandra

**Tanja** - You were trying to get that ultra fine, the needles and the syringes.

**Main** - Ok.

**Tanja** - Ok now the lances, test strips and the syringes come from a DME company, she can not get those through the pharmacy.

**Main** - Ok, that is no problem Ma'am and actually I just ran that recheck to get the phone numbers and information, we actually had a different issue with this patient, when she was signed up for VIVA Medicare, she used to have the teachers retirement through Blue Cross Blue Shield of Alabama, and somebody came to her home and signed her up for VIVA, and when they did that initially, they had signed her up for a VIVA plan that had like a cap on how much medicine she could get and that what I was trying to check and see, we have tried our best to get that cap lifted or get her converted to a different type of plan and what we were actually trying to do today was to just have someone look in the computer and verify that she had unlimited amount of money that could be spent on her medications, if that makes any sense, she is a diabetic, her medications run about $8,000.00 to $10,000.000 per year and on that new plan they had signed her up on is had a cap of $5,000.00 give or take a little bit I don't remember the exact figure, but the bottom line was, she was going to be in big trouble, so we were trying to get that resolved and she came back today and I was just trying to call and see what the current status of her drug plan is.

**Tanja** - Ok, so you are trying to get her converted to something else.

**Main** - Well we were actually not trying to do anything, we just wanted to know today was she listed there with a like, was she still on this drug plan that had the max amount of money that can be spent.

**Tanja** - Correct, that is the one she is still on.

**Main** - She is still on that, and what is the cap because I am trying to help her with her medications so we can do what she really needs and we may have to switch something because she is going to have to make it the whole year on that limited amount of money that yall will pay, and I didn't know, what is that cap.

**Tanja** - One moment.

**Main** - Ok, thank you.

**Tanja** - Ok, thanks for waiting.

**Main** - Yes no problem.

**Tanja** - The cap is for $3,000.00 .

**Main** - $3,000.00 maximum.

**Tanja** - Um hum.

**Main** - Alright, you understand where the problem is for her there, and Ma'am what was your name again.

**Tanja** - T-A-N-J-A